STATE of Wisconsin,
Plaintiff-Respondent-Petitioner,

v.

Donovan M. BURRIS, Defendant-Appellant.

Supreme Court

*No. 2009AP956–CR. Oral argument February 2, 2011.*
*—Decided May 17, 2011.*

2011 WI 32

(Also reported in 797 N.W.2d 430.)

For the plaintiff-respondent-petitioner the cause was argued by *Maura F.J. Whelan,* assistant attorney general, with whom on the briefs was *J.B. Van Hollen,* attorney general.

For the defendant-appellant there were briefs and oral argument by *Byron C. Lichstein, Frank J. Remington Center, University of Wisconsin Law School,* Madison.

¶ 1. N. PATRICK CROOKS, J. This is a review of an unpublished decision of the court of appeals[1] reversing the circuit court's judgment of conviction and denial of Donovan M. Burris's (Burris) motion seeking postconviction relief and a new trial. The underlying incident began as an argument between Burris and the mother of his two young children, Khadijah Rashada (Khadijah), and escalated into the shooting of Khadijah's brother, Kamal Rashada (Kamal), which left Kamal paralyzed. Burris was subsequently convicted of first-degree reckless injury while armed contrary to Wis. Stat. § 940.23(1)(a) and § 939.63 (2007–08)[2] and being a felon in possession of a firearm contrary to Wis. Stat. § 941.29(2)(a).

¶ 2. At trial, the central focus was whether Burris acted with utter disregard for human life, an element of Wis. Stat. § 940.23(1)(a). The State presented testimony about Burris's actions before and during the shooting from Kamal, Khadijah, and their mother Cathy Rashada (Cathy) that tended to show he acted with utter disregard for human life. Burris testified on his own behalf, asserting that the shooting was an accident, and also attempted to impeach the Rashadas' testimony with inconsistencies between their testimony and in prior statements.

---

[1] *State v. Burris,* No. 2009AP956–CR, unpublished slip op. (Wis. Ct. App. Jan. 26, 2010).

[2] All subsequent references to the Wisconsin Statutes are to the 2007–08 version unless otherwise indicated.

¶ 3. Both sides also put forth evidence of Burris's conduct after the shooting that was relevant to the utter disregard element. Burris, Kamal, Khadijah, and Cathy all agreed that immediately after the shooting, Burris expressed remorse and stated that the shooting was unintentional. The State also presented evidence that, after expressing his regret for shooting Kamal for about one minute, Burris left the apartment, did not contact the Rashada family to inquire about Kamal's condition, and evaded police for approximately five months.

¶ 4. After hearing this evidence and receiving the pattern jury instruction for first-degree reckless injury, Wis JI—Criminal 1250, including the utter disregard for human life element, the jury asked: "Regarding the element of utter disregard, all other facts and circumstances relating to the incident, do we consider facts and circumstances after the shooting?" The circuit court, after conferring with counsel and over Burris's objection, gave the jury a supplemental instruction, which quoted verbatim part of this court's decision in *State v. Jensen*, 2000 WI 84, 236 Wis. 2d 521, 613 N.W.2d 170.

¶ 5. Following his conviction, Burris moved for postconviction relief on several grounds, including a challenge to the supplemental jury instruction as unconstitutionally misleading, all of which the circuit court denied. The court of appeals reversed and remanded for a new trial based on Burris's challenge to the supplemental jury instruction and thus did not reach Burris's other claims. The State petitioned this court for review, which we granted.

¶ 6. The State raises the following issues for review: (1) whether a fact-finder, in determining whether a defendant acted with utter disregard for human life, should give his conduct after a crime less weight than his conduct before and during the incident, and (2) whether

there is a reasonable likelihood that the jury applied the circuit court's supplemental jury instruction in an unconstitutional manner.

¶ 7. We conclude that, in an utter disregard analysis, a defendant's conduct is not, as a matter of law, assigned more or less weight whether the conduct occurred before, during, or after the crime. We hold that, when evaluating whether a defendant acted with utter disregard for human life, a fact-finder should consider any relevant evidence in regard to the totality of the circumstances.

¶ 8. We further hold that Burris has not established a reasonable likelihood that the jury applied the supplemental jury instruction on the utter disregard for human life element in an unconstitutional manner. We are satisfied that the supplemental instruction did not mislead the jury into believing that it could not consider Burris's relevant after-the-fact conduct in its determination on utter disregard for human life.

¶ 9. Therefore, we reverse the court of appeals decision and remand the case to allow the court of appeals to decide the other claims Burris raised before it.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

¶ 10. The Rashada family and Burris disagree about the details of what led up to the shooting on September 5, 2007, that led to the charges at issue in this case. Relevant discrepancies in their testimony are discussed in more detail below; however, the basic facts are as follows.

¶ 11. Burris arrived unannounced at the Rashada residence to talk to Khadijah and to see their two children. Cathy, Kamal, Khadijah, and the two children

94

were present when Burris arrived. Burris had with him a loaded .45 caliber pistol with a hair trigger and a disabled safety. Burris and Khadijah got into an argument over the children and a male friend of Khadijah's, which developed into a shouting match in which obscenities were exchanged.

¶ 12. What happened during the argument leading up to the shooting was the heart of the dispute at trial regarding whether Burris acted with utter disregard for human life. However, no one disputes that Kamal was shot in the neck, at close range, and as a result was hospitalized for two months and left paralyzed.

¶ 13. After the shooting, Burris evaded police for approximately five months before turning himself in. The State charged Burris with first-degree reckless injury while armed contrary to Wis. Stat. § 940.23(1)(a)[3] and § 939.63,[4] and being a felon in possession of a

---

[3] Wis. Stat. § 940.23(1)(a) provides: "Whoever recklessly causes great bodily harm to another human being under circumstances which show utter disregard for human life is guilty of a Class D felony."

[4] Wis. Stat. § 939.63 provides in relevant part:

(1) If a person commits a crime while possessing, using or threatening to use a dangerous weapon, the maximum term of imprisonment prescribed by law for that crime may be increased as follows:

(a) The maximum term of imprisonment for a misdemeanor may be increased by not more than 6 months.

(b) If the maximum term of imprisonment for a felony is more than 5 years or is a life term, the maximum term of imprisonment for the felony may be increased by not more than 5 years.

(c) If the maximum term of imprisonment for a felony is more than 2 years, but not more than 5 years, the maximum term of imprisonment for the felony may be increased by not more than 4 years.

firearm contrary to Wis. Stat. § 941.29(2)(a).[5] In a three-day trial before the Milwaukee County Circuit Court, the Honorable William Sosnay presiding, the State and Burris presented different accounts of Burris's conduct leading up to the shooting.

¶ 14. For the State, Kamal, Cathy, and Khadijah testified to the following version of events. When Burris arrived at the house, he briefly spoke with Cathy about buying diapers and formula for the children. Shortly thereafter, Khadijah and Burris began to argue, and Burris began to threaten Khadijah and swear at her. Khadijah and Burris continued this argument in the living room, where Burris had his gun out and was waving it around. Cathy and Khadijah asked Burris to leave, but he refused and continued to threaten Khadijah and wave the gun around. The two young children were present in the living room at the time. While Burris and Khadijah were arguing in the living room near the front door, Kamal was standing behind Burris. Kamal tapped Burris on his left side to get his attention and asked him to leave. When Kamal tapped him, Burris turned around, raised the gun, called Kamal the " 'N' word," and shot Kamal in the neck at close range.

---

(d) The maximum term of imprisonment for a felony not specified in par. (b) or (c) may be increased by not more than 3 years.

[5] Wis. Stat. § 941.29 provides in relevant part:

(1) A person is subject to the requirements and penalties of this section if he or she has been:

(a) Convicted of a felony in this state.

. . . .

(2) A person specified in sub. (1) is guilty of a Class G felony if he or she possesses a firearm under any of the following circumstances:

(a) The person possesses a firearm subsequent to the conviction for the felony or other crime, as specified in sub. (1) (a) or (b).

¶ 15. During cross-examination, Burris attempted to impeach these witnesses regarding some inconsistencies in their testimony. Kamal's testimony differed from what he told Officer Vartanian in the ambulance right after the shooting. Kamal told Officer Vartanian that Kamal pushed the gun away from Khadijah and then pushed Burris out the front door, at which time Burris reached back inside and shot Kamal. Kamal explained at trial that Officer Vartanian may have misunderstood what he said, but that his testimony at trial was correct. Cathy testified that she saw Burris raise the gun before shooting Kamal, but in an earlier statement to police she had stated that she did not see Burris raise the gun. Khadijah testified that Burris waved the gun around before he raised it to shoot Kamal, but in an earlier statement to Officer Koscielak, Khadijah had stated that Burris kept the gun by his side. Khadijah also testified that Kamal had only tapped Burris when Burris turned and raised the gun to shoot Kamal, but in an earlier statement to police she had stated that Kamal grabbed Burris's wrist before Burris shot him. On redirect, the State attempted to reconcile some of these inconsistencies.

¶ 16. Burris presented the following version of what happened leading up to the shooting. Burris entered the apartment, spoke with Cathy briefly, and then went to the bedroom to put the gun he had with him under the mattress. Burris had a gun with him for his protection because, after an argument with some associates of the Rashadas' neighbors, he feared for his safety. After stowing the gun, Burris went to the bathroom to talk to Khadijah and to see his children. Burris and Khadijah's conversation developed into an argument, which continued as they moved into the bedroom. While they did get into a heated argument and exchange

obscenities, Burris never threatened Khadijah. When Cathy came into the bedroom and asked Burris to leave, he complied by grabbing his gun and heading for the door but began to argue with Khadijah again in the living room. Burris never raised the gun or waved it around but kept it by his side. Burris claimed that while Burris and Khadijah were arguing near the front door, Kamal grabbed Burris's right wrist from behind, and that when Burris turned and pulled his hand away, the gun went off and shot Kamal.

¶ 17. The Rashadas and Burris presented similar testimony regarding what happened after the shooting. Immediately after the shooting, Burris called out to Kamal and stated that he did not mean to shoot him and that he hoped Kamal would not die. Burris asked either Cathy or Khadijah to shoot him and tried to hand over the gun. After about one minute, Burris stated he could not go to jail and left the apartment. Burris then evaded police, leaving Milwaukee for about two weeks, before he ultimately turned himself in a little less than five months after the shooting. Burris did not contact the Rashada family to inquire about Kamal's condition. Shortly before Burris turned himself in to police, he called Camilla Rashada (Camilla), Kamal's sister, to explain to her that he had not intended to shoot Kamal.

¶ 18. The circuit court gave the pattern jury instruction for first-degree reckless injury, which, pertinent to the utter disregard for human life element, provides:

> In determining whether the conduct showed utter disregard for human life, you should consider these factors: What the defendant was doing, how dangerous the conduct was, how obvious the danger was, whether the conduct showed any regard for life and all other facts and circumstances relating to the conduct.

Wis JI-Criminal 1250; *see also* Wis JI—Criminal 924A (providing a nearly identical instruction for the utter disregard element).

¶ 19. At some point during the deliberations, the jury submitted the following question to the circuit court: "Regarding the element of utter disregard, all other facts and circumstances relating to the incident, do we consider facts and circumstances after the shooting?"

¶ 20. To respond to the jury's question, the circuit court suggested giving a supplemental jury instruction quoting language in *Jensen,* 236 Wis. 2d 521, ¶ 32. Burris responded that the pattern jury instruction was complete and sufficient, and that the circuit court could respond simply by charging the jury to apply their common sense reading of the pattern instruction. Over Burris's objection, the circuit court gave the following supplemental instruction:

> First of all, I want to emphasize that you are to rely on the instructions that I gave you. All right? And to rely on all of the instructions that I gave you.
>
> And in response to this question, if this clarifies anything, after-the-fact regard for human life does not negate utter disregard otherwise established by the circumstances before and during the crime. It may be considered by the fact-finder as a part of the total factual picture, but it does not operate to preclude a finding of utter disregard for human life. The element of utter disregard for human life is measured objectively on the basis of what a reasonable person in the defendant's position would have known.

¶ 21. The jury convicted Burris on all charges, and Burris moved for postconviction relief on the following grounds: (1) Burris's counsel was ineffective

because he elicited harmful other-acts testimony from Cathy, failed to request a cautionary instruction for this evidence, and failed to object to the State's improper closing argument regarding its charging decision, and (2) the circuit court erred by giving the jury this supplemental instruction. The Milwaukee County Circuit Court, the Honorable Dennis R. Cimpl presiding, denied Burris's motion, and Burris appealed.

¶ 22. The court of appeals reversed, concluding that, while the language in the supplemental jury instruction was legally accurate, there was a reasonable likelihood that the jury applied the supplemental instruction in an unconstitutional manner.[6] *State v. Burris*, No. 2009AP956–CR, unpublished slip op., ¶ 33 (Wis. Ct. App. Jan. 26, 2010). The court of appeals stated that it agreed with the State and Burris that the correct answer to the jury's question was yes. *Id.*, ¶ 28. The court of appeals concluded that, in response to the

---

[6] Because the court of appeals reversed based on its conclusion that the supplemental jury instruction was erroneous, the court of appeals did not address Burris's three other claims. *Burris*, No. 2009AP956–CR, ¶ 1. Before the court of appeals, Burris argued that he was entitled to a new trial for the following reasons:

> (1) the trial court erroneously answered the jury's question concerning whether after-the-shooting conduct could be considered in a manner which misled the jury; (2) the trial court erred when it allowed the State to cross-examine Burris on an irrelevant issue and then also allowed the State to present rebuttal evidence on that issue; (3) trial counsel provided ineffective assistance in several respects; and (4) a new trial is warranted in the interest of justice.

*Id.*

As the State petitioned this court for review of the sole issue upon which the court of appeals decision was based, Burris's other claims are not before us.

jury's question, the supplemental jury instruction, which took language out of context from *Jensen,* suggested that Burris's after-the-fact conduct was not significant and could not outweigh his conduct before and during the crime. *Id.,* ¶ 32. Because the court of appeals concluded that this was an inaccurate portrayal of the law and that it was reasonably likely that the supplemental instruction misled the jury in this way, it reversed the circuit court's judgment of conviction. *Id.,* ¶¶ 32–33. In his dissent, the Honorable Ralph Adam Fine noted that the supplemental instruction explained that the jury could consider after-the-fact conduct "as a part of the total factual picture" and thus the instruction could not have misled the jury. *Id.,* ¶¶ 35–37 (Fine, J., dissenting) (quoting *Jensen,* 236 Wis. 2d 521, ¶ 32).

¶ 23. The State petitioned this court for review, which we granted. We begin by clarifying that, in an analysis of whether a defendant acted with utter disregard for human life, the fact-finder should consider the totality of the circumstances, including all relevant evidence of a defendant's conduct before, during, and after the crime.[7] We then conclude, considering the

---

[7] While this first issue was not raised as a separate issue in the State's petition for review, we note that the State briefed and argued the issue of whether conduct after a crime should be entitled to less weight than other conduct. In its petition for review, the State discussed but did not fully articulate its position on this issue; however, in its briefs before this court and during oral argument it clarified its argument in this regard. Burris also addressed this issue in his brief and at some length during oral argument, asserting that this court should dismiss the State's petition as improvidently granted because the State had changed its position on the evidentiary weight due a defendant's after-the-fact conduct. Because this issue presents a question of law, which both parties briefed and argued, and "is of sufficient public interest to merit a decision," we exercise our

proceedings as a whole, that Burris has not established a reasonable likelihood that the jury applied the supplemental jury instruction in an unconstitutional manner, that is, that the jury was misled into believing that it could not consider Burris's relevant after-the-fact conduct in its determination on utter disregard for human life.

## II. ANALYSIS

¶ 24. Allegations that the jury improperly applied legally correct jury instructions in a manner that denied the defendant due process raise questions of constitutional fact that this court reviews de novo. *State v. Lohmeier*, 205 Wis. 2d 183, 191–92, 556 N.W.2d 90 (1996). We examine the challenged jury instructions in light of the proceedings as a whole, keeping in mind that circuit courts have broad discretion in deciding which instructions to give. *Id.* at 194; *Nommensen v. Am. Cont'l Ins. Co.*, 2001 WI 112, ¶ 50, 246 Wis. 2d 132, 629 N.W.2d 301.

### A. Evidentiary Weight of a Defendant's After-the-Fact Conduct

¶ 25. The State argues that, while it may be considered as part of the totality of the circumstances, a defendant's after-the-fact mitigating conduct does not have the same evidentiary weight as a defendant's actions before and during the crime. The State relies on the language in *Jensen* quoted by the circuit court in the

discretion to address it. *See State v. Ward*, 2000 WI 3, ¶ 45, 231 Wis. 2d 723, 604 N.W.2d 517 (quoting *Apex Elec. Corp. v. Gee*, 217 Wis. 2d 378, 384, 577 N.W.2d 23 (1998)).

supplemental jury instruction, and on the court of appeals decisions in *State v. Edmunds,* 229 Wis. 2d 67, 598 N.W.2d 290 (Ct. App. 1999), and *State v. Holtz,* 173 Wis. 2d 515, 496 N.W.2d 668 (Ct. App. 1992). The State notes that the court of appeals distinguished between the defendants' conduct depending upon when it occurred. The State infers from these factual analyses that, in a determination of utter disregard, after-the-fact conduct is not as significant as conduct before and during the injury. Further, the State asserts that language to the contrary in *State v. Miller,* 2009 WI App 111, 320 Wis. 2d 724, 772 N.W.2d 188, is based on an incorrect interpretation of *Jensen.*

¶ 26. Burris disagrees with the State's interpretation of the utter disregard standard. Burris argues that this court and the court of appeals have consistently held that whether a defendant showed utter disregard for human life is a totality of the circumstances analysis in which the fact-finder may consider conduct before, during, and after the incident. Burris asserts that this is consistent with Wis. Stat. § 940.23(1)(a), the pattern jury instructions, Wis JI—Criminal 924A and 1250, and utter disregard case law, *see, e.g., Miller,* 320 Wis. 2d 724; *Edmunds,* 229 Wis. 2d 67; *Holtz,* 173 Wis. 2d 515; *Jensen,* 236 Wis. 2d 521. Burris notes that, in the decisions that the State relies on, this court and the court of appeals were evaluating the sufficiency of the evidence, and thus any characterization of a particular category of evidence was limited to the facts of that case.

¶ 27. We reject the State's assertion and emphasize that in an utter disregard analysis there is no rule assigning more or less weight to a particular category of a defendant's conduct based on when that conduct occurred.

103

¶ 28. Both parties agree that Wis. Stat. § 940.23(1)(a) is not instructive regarding what evidence establishes utter disregard.[8] Rather, decisions of this court and the court of appeals provide the well-established standard.

¶ 29. We most recently addressed the proper analysis for utter disregard for human life in *Jensen,* 236 Wis. 2d 521. Jensen was convicted of first-degree reckless injury for vigorously shaking his infant son, leaving him with permanent, life-altering disabilities. *Id.*, ¶ 1. The following facts were presented at trial. During an overnight visit, Jensen's ten-week-old, 12–pound son began to cry uncontrollably. *Id.*, ¶ 6. After unsuccessfully trying to soothe him, Jensen vigorously shook his son 7 to 15 times, such that the infant's head snapped forward, hitting his chest, and back, and Jensen stopped shaking him only when the baby stopped crying. *Id.* After about 30 seconds, Jensen called 911 and told the operator that he had an "accident" with his son—tripping over a phone cord while holding him. *Id.*, ¶¶ 6–7.

¶ 30. Jensen appealed the conviction, arguing that (1) the State was required to, but did not, prove Jensen's "subjective awareness that shaking his son posed an extreme risk of death," (2) the circumstances—the excessive use of disciplinary force—were not sufficient to establish utter disregard for human life, and (3) calling 911 after he realized his son was having trouble breathing showed regard for his life and precluded a finding of utter disregard. *Id.*, ¶ 2.

---

[8] The statute does not elaborate on the definition of utter disregard for human life, or what conduct establishes that element, but simply proscribes recklessly causing injury "under circumstances which show utter disregard for human life." Wis. Stat. § 940.23(1)(a).

¶ 31. This court first clarified that whether a defendant acted with utter disregard for human life is an objective analysis, dependent upon "what a reasonable person in the defendant's position would have known," which may be "proven by evidence relating to the defendant's subjective state of mind—by the defendant's statements, for example, *before, during and after the crime." Id.*, ¶ 17 (emphasis added).

¶ 32. Turning to the sufficiency of the evidence, this court noted that in an utter disregard analysis "the factfinder is to consider 'all the factors relating to the conduct . . . includ[ing] . . . what the defendant was doing; why he was doing it; how dangerous the conduct was; how obvious the danger was and whether the conduct showed any regard for human life.' " *Id.*, ¶ 24 (quoting Wis JI—Criminal 1250). We elaborated that:

> In conducting such an examination, we consider the type of act, its nature, why the perpetrator acted as he/she did, the extent of the victim's injuries and the degree of force that was required to cause those injuries. We also consider the type of victim, the victim's age, vulnerability, fragility, and relationship to the perpetrator. And finally, we consider *whether the totality of the circumstances showed any regard for the victim's life.*

*Id.* (quoting *Edmunds,* 229 Wis. 2d at 77) (emphasis added).

¶ 33. Ultimately, under the sufficiency of the evidence standard of review and in response to Jensen's claim that the 911 call precluded a finding of utter disregard, this court concluded:

> After-the-fact regard for human life does not negate "utter disregard" otherwise established by the circumstances before and during the crime. It may be consid-

ered by the factfinder as a part of the total factual picture, but it does not operate to preclude a finding of utter disregard for human life.

*Id.*, ¶ 32.

¶ 34. Viewed in light of the rest of our decision in *Jensen* and the context of that language, *Jensen* does not, as a matter of law, assign more or less weight to a defendant's conduct, whether that conduct occurred before, during, or after the incident. After explaining that the fact-finder should consider a defendant's relevant conduct "before, during and after the crime" in reviewing, under the totality of the circumstances, whether the defendant acted with utter disregard for human life, we applied that standard to the particular facts in *Jensen*. *Id.*, ¶¶ 17, 24. In response to Jensen's claim that mitigating actions taken after the fact necessarily "preclude" a finding of utter disregard, we clarified that no such rule exists and that, given the circumstances in *Jensen*, his 911 call did not show sufficient regard for human life to require the reversal of the fact-finder's determination that his conduct as a whole evinced utter disregard. *Id.*, ¶¶ 30–32. This conclusion should not be read in isolation, but rather along with the standard for an utter disregard analysis provided in *Jensen*.

¶ 35. Nor should the way in which we distinguished some of our previous decisions in *Jensen* suggest that we created a new standard based upon those distinctions. *See Id.*, ¶¶ 30–31 (distinguishing *Wagner v. State*, 76 Wis. 2d 30, 250 N.W.2d 331 (1977) and *Balistreri v. State*, 83 Wis. 2d 440, 265 N.W.2d 290 (1978)). In *Wagner* and *Balistreri* the mitigating conduct—the defendants' attempt to avoid an accident —led this court to conclude that there was insufficient

106

evidence to support a finding of utter disregard. *Wagner,* 76 Wis. 2d at 47; *Balistreri,* 83 Wis. 2d at 458. The factual distinctions we pointed out in *Jensen* between Wagner's and Balistreri's attempts to avoid injuring someone and Jensen's decision to call 911 after inflicting the injury simply supported our conclusion regarding the sufficiency of the evidence in *Jensen.* This did not create a rule assigning less weight to a defendant's after-the-fact conduct.

¶ 36. The court of appeals concisely noted as much in *Miller,* 320 Wis. 2d 724, in response to an argument similar to the State's argument in this case regarding the role of after-the-fact conduct in an utter disregard calculus:

> For this reason, we reject the State's suggestion that *Wagner, Balistreri* and *Jensen* may be read to stand for the proposition that evidence of "after-the-fact" regard for life is of less import than conduct evincing regard for life during and before the act. *Courts consider the totality of the circumstances when determining whether the defendant showed some regard for life, which may include conduct occurring before, during and after the commission of the criminally reckless act itself.*

*Id.,* ¶ 35 n.12 (emphasis added) (citations omitted).

▆

¶ 37. Thus, the State's reliance on the court of appeals decisions in *Holtz* and *Edmunds,* rejecting sufficiency of the evidence claims premised on a defendant's after-the-fact mitigating conduct, is misplaced. In *Holtz,* the court of appeals distinguished *Wagner* and *Balistreri,* concluding that the defendant's ultimate decision to stop his attack, in light of his other aggravating conduct, was not significant enough to reverse the finding of utter disregard. *Holtz,* 173 Wis. 2d at 519–20. In *Edmunds,* the court of appeals

also concluded that a 911 call "when combined with the violence perpetrated against so fragile a victim, did not require the jury to find that Edmunds's conduct had not demonstrated an utter disregard." 229 Wis. 2d at 78. The court of appeals' assessment of the relative weight of the evidence in each case was not an endorsement of that delineation in every case. Reviewing courts may find distinctions between defendants' conduct in sufficiency of the evidence cases useful in reviewing a fact-finder's determination, but their use of such patterns does not mean that new legal standards should be grafted onto the fact-finder's initial determination of whether certain conduct demonstrates an utter disregard.

¶ 38. In its totality of the circumstances analysis, the fact-finder should consider all evidence relevant to whether a defendant acted with utter disregard for human life. *Jensen,* 236 Wis. 2d 521, ¶¶ 17, 24. The weight to be given evidence of a defendant's conduct or statements is for the trier of fact, often a jury, to decide. This accords with the well-settled maxim in Wisconsin that "questions of the weight and reliability of relevant evidence are matters for the trier of fact." *State v. Fischer,* 2010 WI 6, ¶ 36, 322 Wis. 2d 265, 778 N.W.2d 629. There is no bright-line rule regarding the evidentiary weight of a particular category of a defendant's conduct depending on when that conduct occurred relative to the crime.[9]

---

[9] As the court of appeals noted in *State v. Miller,* 2009 WI App 111, ¶ 37, 320 Wis. 2d 724, 772 N.W.2d 188, we have "carefully avoided *per se* rules in this area and instead [have] consistently applied a totality of the circumstances approach to the cases." We continue along that path today.

¶ 39. We note that an instruction to consider the totality of the circumstances is a broad standard, but it is not without some limits. As part of the totality of the circumstances analysis, the fact-finder should consider a defendant's relevant conduct before, during and after the crime. *Jensen,* 236 Wis. 2d 521, ¶¶ 17, 24. A defendant's conduct is relevant if it occurs within a reasonable period of time after the crime. The length of time will depend on the circumstances in each case and is limited by the requirement that evidence is admissible only if it is relevant to some element of the crime, in this case, whether the defendant acted with utter disregard for human life. *See* Wis. Stat. § 904.02 (2009–10).

¶ 40. We also recognize a concern underlying the State's argument: that a jury could give undue weight to a defendant's remorse after the fact and return a finding of not guilty of a first-degree reckless offense even when a defendant's other conduct clearly evinces utter disregard. However, this concern does not justify creating a bright-line rule and limiting the jury's role of weighing evidence.[10] We are satisfied that an instruction to con-

---

[10] Justice Prosser, in his concurrence, misinterprets the law providing what evidence a fact-finder may use to decide the utter disregard element. As discussed above, this court and the court of appeals have consistently held that a fact-finder may consider relevant evidence of a defendant's state of mind to determine the subjective part of the element of utter disregard, including all of a defendant's relevant conduct and statements surrounding the crime.

By including the phrase "under circumstances which show," the legislature has recognized that to determine whether a defendant acted with utter disregard for human life the fact-finder must look to the surrounding circumstances, which include the defendant's relevant conduct and statements. Wis. Stat.

sider the totality of the circumstances, i.e., not giving undue weight to any particular evidence, applied along with the jurors' common sense, will allow the jury to fairly and appropriately apply the instruction and follow the law. *See* Wis JI—Criminal 924A (The Committee declined to further define what constitutes utter disregard because "[t]he jury should be able to give the phrase a common sense meaning in determining whether the conduct is such that it amounts to an aggravated reckless offense."); *see also* Wis JI—Criminal 1250 n.5 (providing a nearly verbatim explanation).

¶ 41. We reaffirm our previous decisions and hold that when evaluating whether a defendant's conduct reflects utter disregard for human life, the fact-finder should examine the totality of the circumstances surrounding the crime. In this analysis, the fact-finder should consider all relevant conduct before, during and after a crime, giving each the weight it deems appropriate under the circumstances. Upon clarifying the appropriate standard for utter disregard, we turn to whether Burris established a reasonable likelihood that the supplemental jury instruction unconstitutionally misled the jury.

## B. Propriety of the Supplemental Jury Instruction

¶ 42. Consistent with its argument above, the State first asserts that, since after-the-fact conduct is entitled to less weight, the supplemental instruction did not mislead the jury if it conveyed as much. Second, the

§ 940.23(1)(a). Nothing in the statute limits the relevant circumstances to those before and during the crime, and logic dictates that those circumstances cannot be so limited.

State argues that the court of appeals improperly failed to consider the proceedings and instructions as a whole when concluding that there was a reasonable likelihood that the jury was misled. Third, the State asserts that the court of appeals failed to recognize that Burris had the burden of proof to establish a reasonable likelihood. Fourth, the State points out that, under *Lohmeier*, reversal is warranted only if there is a reasonable likelihood that the jury applied the instruction in an unconstitutional manner, but the court of appeals did not address any constitutional violation. *See Lohmeier*, 205 Wis. 2d at 193–94. Finally, the State argues that it was just as likely that the jury considered Burris's aggravating after-the-fact conduct of fleeing as it was that the jury considered his remorse immediately after the shooting.

¶ 43. Burris responds that the correct response to the jury's question was simply "yes," or an instruction to review the previously given pattern jury instruction and to follow the directions within that instruction to answer its question. Burris argues that the *Jensen* language confused the jury and, because it was taken out of context, suggested "that the after-the-fact conduct was less important and could not make the difference between finding or not finding utter disregard." Thus, Burris asserts that, given the conflicting testimony regarding what happened leading up to the shooting, the consistent testimony regarding Burris's remorse after the shooting, and the fact that the jury asked this question—demonstrating that it thought Burris's after-the-fact conduct was significant—and got a confusing response, it is reasonably likely that the supplemental instruction was unconstitutionally misleading.

¶ 44. There are two types of jury instruction challenges: those challenging the legal accuracy of the instructions, and those alleging that a legally accurate

111

instruction unconstitutionally misled the jury. *See Lohmeier,* 205 Wis. 2d at 192. This is the latter challenge. Both parties agree that the language in the supplemental jury instruction, taken directly from *Jensen,* 236 Wis. 2d 521, ¶ 32, was legally accurate. Thus, Burris challenges whether that instruction led the jury to misapply the law.

¶ 45. A defendant is entitled to reversal if "there is a reasonable likelihood that the jury applied the challenged instruction[] in a manner that violates the constitution." *Lohmeier,* 205 Wis. 2d at 193. The reviewing court should not examine the challenged jury instruction in isolation but rather "should view the jury instructions in light of the proceedings as a whole." *Id.* at 194. We begin by clarifying certain aspects of the reasonable likelihood standard.

¶ 46. It is the defendant's burden to establish a reasonable likelihood that the jury unconstitutionally applied an instruction. *See id.* at 193; *Boyde v. California,* 494 U.S. 370, 380 (1990); *Waddington v. Sarausad,* 555 U.S. 179, 129 S. Ct. 823, 831 (2009). While the question of burden of proof was not specifically addressed in *Lohmeier,* in clarifying the standard of review, we explained that we were following the standard set forth by the United States Supreme Court in *Boyde. Lohmeier,* 205 Wis. 2d at 193. Thus, the placement of the burden in this United States Supreme Court case and others applying it is instructive here.

¶ 47. In *Boyde,* the United States Supreme Court examined whether a jury instruction given in the penalty phase of a homicide trial prohibited the jury from considering the defendant's mitigating conduct relevant to whether the death penalty was warranted, even

though not necessarily relevant to guilt or innocence of the crime charged. 494 U.S. at 373, 377–78. As we did in *Lohmeier*, the Supreme Court clarified the appropriate standard for challenges to legally correct jury instructions, and in so doing, suggested that the defendant bore the burden of establishing a reasonable likelihood of unconstitutional application. *Boyde*, 494 U.S. at 380.

¶ 48. More recently, in *Waddington*, 129 S. Ct. at 831, the United States Supreme Court reaffirmed *Boyde*, and emphasized that the burden was the defendant's. In reviewing a challenge to a legally accurate instruction on the basis that the jury may have been misled into incorrectly applying that instruction, the Court stated that "*the defendant must show* both that the instruction was ambiguous and that there was a reasonable likelihood that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." *Waddington*, 129 S. Ct. at 831 (emphasis added and internal quotations omitted). While, in *Lohmeier*, we had not explicitly placed the burden of proof on the defendant, we do so now.[11]

¶ 49. A defendant meets this burden only if he or she establishes that a constitutional violation was rea-

---

[11] This conclusion is in line with the placement of the burden in other contexts in appeals challenging the constitutionality of a criminal conviction. *See, e.g., State v. Johnson*, 153 Wis. 2d 121, 127, 449 N.W.2d 845 (1990) (burden on defendant to prove reasonable probability of prejudice in ineffective assistance of counsel claim); *State v. Smith*, 2010 WI 16, ¶¶ 8–9, 323 Wis. 2d 377, 780 N.W.2d 90 (burden on defendant to prove unconstitutionality of statute under which he was convicted). It is also clearly in line with the United States Supreme Court cases discussed herein.

sonably likely. *Lohmeier,* 205 Wis. 2d at 193. "Wisconsin courts should not reverse a conviction simply because the jury possibly could have been misled; rather a new trial should be ordered only if there is a reasonable likelihood that the jury was misled and therefore applied potentially confusing instructions in an unconstitutional manner." *Id.* at 193–94. The United States Supreme Court has further explained in *Boyde* that, "[a]lthough a defendant need not establish that the jury was more likely than not to have been impermissibly inhibited by the instruction . . . [there is no constitutional violation] if there is only a possibility of such an inhibition." 494 U.S. at 380. Even some "ambiguity, inconsistency, or deficiency" in an instruction does not violate due process unless there is a reasonable likelihood that, considering the whole trial, the jury unconstitutionally applied the instruction. *Waddington,* 129 S. Ct. at 831–32 (quoting *Middleton v. McNeil,* 541 U.S. 433, 437 (2004)).

¶ 50. A jury is *unconstitutionally* misled if there is a reasonable likelihood that the instruction was applied in a manner that denied the defendant "a meaningful opportunity for consideration by the jury of his defense . . . . to the detriment of a defendant's due process rights." *Lohmeier,* 205 Wis. 2d at 192. Thus, a jury applies an instruction in an unconstitutional manner if it believes that such instruction precludes "the consideration of constitutionally relevant evidence." *Boyde,* 494 U.S. at 380.

¶ 51. Applying the above standard to the case at hand, we hold that Burris has not established a reasonable likelihood that the jury applied the supplemental instruction in an unconstitutional manner. The jury

114

applied the instructions properly if it understood that, in determining whether Burris acted with utter disregard for human life, it should consider the totality of the circumstances including Burris's relevant conduct before, during and after the shooting. *See Jensen*, 236 Wis. 2d 521, ¶¶ 17, 24. Because we examine the challenged jury instruction in light of the whole proceedings, the evidence presented at trial along with the initial instruction, the jury's question, and the supplemental instruction are all relevant to our analysis.

¶ 52. The State presented evidence from the Rashadas about the events leading up to the shooting. The parties agree that, if believed, the Rashada family's testimony—that Burris waved around a loaded .45 caliber pistol, raised the gun, pointed it at Kamal, and shot him in the neck at point-blank range—established that Burris acted with utter disregard.

¶ 53. Burris, however, presented a different account of how the shooting happened and what he did before it occurred. His testimony, if believed, suggests that he did not act with utter disregard and that the shooting was an unfortunate accident. Burris also asserts that he significantly impeached the Rashadas' testimony about what happened before the shooting by highlighting several inconsistencies.

¶ 54. Both Burris and the Rashadas testified that immediately after the shooting, Burris showed remorse, stated that he hoped Kamal would not die, and was so distraught that he offered his gun to either Cathy or Khadijah and asked one of them to shoot him. By all accounts, this lasted about one minute.

¶ 55. Then, Burris left the apartment and evaded police for about five months before turning himself in. To avoid capture, Burris left Milwaukee for approximately two and a half weeks. Sometime after the

shooting and before turning himself in, Burris disposed of the gun used in the shooting. He also did not contact the Rashada family about Kamal's well-being.

¶ 56. Relevant to the element of utter disregard for human life, the circuit court gave the following instruction from the pattern jury instruction for first-degree reckless injury, Wis JI—Criminal 1250:

> In determining whether the conduct showed utter disregard for human life, you should consider these factors: what the defendant was doing; why the defendant was engaged in that conduct; how dangerous the conduct was; how obvious the danger was; whether the conduct showed any regard for life; and, *all other facts and circumstances relating to the conduct.* (Emphasis added.)

¶ 57. After the jury instructions were given, the State and Burris made their closing arguments, which focused on whether Burris acted with utter disregard for human life. Both the State and Burris brought up the significance of Burris's after-the-fact conduct, including both his remorse immediately after the shooting and his decision to flee the scene and evade police.

¶ 58. During deliberations, the jury submitted the following question to the circuit court: "Regarding the element of utter disregard, all other facts and circumstances relating to the incident, do we consider facts and circumstances after the shooting?"[12]

---

[12] As Burris points out, the jury submitted a substantially similar question while the circuit court and counsel were discussing whether to give a supplemental instruction and what to include in that instruction. The jury asked, "Should we consider facts and circumstances after the shooting in determining utter disregard?" Burris argues that it is significant that the jury asked two questions about whether it could consider after-the-fact conduct; however, we note that the foreperson

116

¶ 59. In response to the jury's question, the circuit court gave the following supplemental instruction:

First of all, I want to emphasize that you are to rely on the instructions that I gave you. All right? And to rely on all of the instructions that I gave you.

And in response to this question, if this clarifies anything, after-the-fact regard for human life does not negate utter disregard otherwise established by the circumstances before and during the crime. It may be considered by the fact-finder as a part of the total factual picture, but it does not operate to preclude a finding of utter disregard for human life. The element of utter disregard for human life is measured objectively on the basis of what a reasonable person in the defendant's position would have known.

¶ 60. Looking at the challenged supplemental instruction in light of the rest of the proceedings, we conclude that Burris has not met his burden. Burris has not established a reasonable likelihood that the jury was unconstitutionally misled given the extensive evidence of Burris's after-the-fact conduct presented at trial, counsel's focus on this evidence in closing statements, and language in both the pattern and supplemental jury instructions indicating that it could consider this conduct in its determination.

¶ 61. There was extensive testimony at trial about Burris's after-the-fact conduct. The key witnesses and Burris himself testified about Burris's remorseful conduct immediately after the shooting, and his actions in leaving the apartment without calling for help, or waiting for it to arrive, and then fleeing from police for approximately five months. After the jury was in-

clarified that the jury submitted two questions before receiving an answer from the circuit court, simply because the jury "thought to ask [the question] more directly."

structed to consider "all other facts and circumstances relating to the [defendant's] conduct" in its utter disregard analysis, the State and Burris highlighted the significance of both the mitigating and aggravating after-the-fact conduct in their respective arguments during closing statements.

¶ 62. The pattern jury instruction told the jury to consider "all other facts and circumstances relating to the [defendant's] conduct." Based on its questions, even after this instruction, the jury was unsure whether it could consider after-the-fact conduct. Significantly, the circuit court responded through the supplemental instruction that after-the-fact conduct "may be considered by the fact-finder as a part of the total factual picture." While other language in the supplemental instruction regarding the role of after-the-fact conduct —"does not negate" and "does not operate to preclude" —taken out of context from *Jensen,* was potentially ambiguous, ambiguity or some possibility that the jury was misled, in and of itself, is not enough to prove a violation of due process.[13] *Lohmeier,* 205 Wis. 2d at 193–94; *Waddington,* 129 S. Ct. at 831–32.

---

[13] Chief Justice Abrahamson's dissent would reverse Burris's conviction and grant him a new trial because of an "ambiguous" or a "potentially ambiguous" supplemental jury instruction, but this is not the appropriate standard. *See* dissent, ¶¶ 93, 95, 98. As our past precedent and that of the United States Supreme Court advises, "Wisconsin courts should not reverse a conviction simply because the jury possibly could have been misled," *State v. Lohmeier,* 205 Wis. 2d 183, 193, 556 N.W.2d 90 (1996), or based on some "ambiguity, inconsistency, or deficiency" in the instruction, *Waddington v. Sarausad,* 555 U.S. 179, 129 S. Ct. 823, 831 (2009) (quoting *Middleton v. McNeil,* 541 U.S. 433, 437 (2004)). The reasonable likelihood standard demands that the defendant articulate something more than an ambiguity or a possibility that the jury was misled, and Burris has not done so in this case. *See supra* ¶ 49.

¶ 63. Given all the evidence and arguments regarding his after-the-fact conduct, and the language in the jury instructions permitting the jury to consider such conduct, Burris has not established a reasonable likelihood that the jury ignored all of that because of a potentially ambiguous instruction. *Lohmeier,* 205 Wis. 2d at 198 ("We find it is not reasonably likely that the jurors would believe this single instruction transformed all of the prior proceedings into a 'virtual charade.' " (quoting *Boyde,* 494 U.S. at 383)). The result, the jury's finding of utter disregard, does not indicate otherwise. Indeed, the result is consistent with the jury considering all the evidence of Burris's conduct before, during, and after the shooting, including both the mitigating after-the-fact conduct (Burris's immediate remorse) and the aggravating after-the-fact conduct (Burris's flight from the apartment and from police).

¶ 64. Burris has not established a reasonable likelihood that the jury was misled in this case, but supplemental instructions such as the one given here, taken out of context from *Jensen,* do have the potential to be confusing. Thus, we recommend that the Criminal Jury Instruction Committee, in its comments to the "first-degree reckless" offense instructions, Wis JI—Criminal 1016–22, 1250, and the utter disregard for human life instruction, Wis JI—Criminal 924A, advise against taking certain language directly from utter disregard cases such as *Jensen* without providing the necessary context to fully explain the proper inquiry. Additionally, we recommend that the Committee consider revising these instructions to more explicitly direct the jury that, in its utter disregard for human life consideration, it should consider the totality of the circumstances including any relevant evidence regarding a defendant's conduct before, during, and after the crime.

119

## III. CONCLUSION

¶ 65. We conclude that a defendant's conduct is not, as a matter of law, assigned more or less weight whether the conduct occurred before, during, or after the crime. We hold that, when evaluating whether a defendant acted with utter disregard for human life, a fact-finder should consider any relevant evidence in regard to the totality of the circumstances.

¶ 66. We further hold that Burris has not established a reasonable likelihood that the jury applied the supplemental jury instruction on the utter disregard for human life element in an unconstitutional manner. We are satisfied that the supplemental instruction did not mislead the jury into believing that it could not consider Burris's relevant after-the-fact conduct in its determination on utter disregard for human life.

¶ 67. Therefore, we reverse the court of appeals decision and remand the case to allow the court of appeals to decide the other claims Burris raised before it.

*By the Court.*—The decision of the court of appeals is reversed, and the cause is remanded to the court of appeals for further proceedings consistent with this opinion.

¶ 68. DAVID T. PROSSER, J. (*concurring*). The defendant, Donovan M. Burris, was convicted of first-degree reckless injury while armed in violation of Wis. Stat. §§ 940.23(1) and 939.63. I concur in the majority's decision to reverse the decision of the court of appeals, which had reversed the circuit court's denial of the defendant's motion for a new trial. In my view, the circuit court's supplemental instruction to the jury was correct.

120

¶ 69. I write separately because I am unpersuaded by the arguments and analysis about the relevance of conduct "after the crime."

¶ 70. The majority opinion reads in part as follows:

> The State raises the following issue[ ] for review: (1) whether a fact-finder, in determining whether a defendant acted with utter disregard for human life, should give his conduct after a crime less weight than his conduct before and during the incident . . .
>
> We conclude that, in an utter disregard analysis, a defendant's conduct is not, as a matter of law, assigned more or less weight whether the conduct occurred before, during, or after the crime. We hold that, when evaluating whether a defendant acted with utter disregard for human life, a fact-finder should consider any relevant evidence in regard to the totality of the circumstances.

Majority op., ¶¶ 6, 7.

¶ 71. I cannot join the conclusion stated in ¶ 7 of the majority opinion.

¶ 72. The statute on *second*-degree reckless injury reads as follows: "Whoever recklessly causes great bodily harm to another human being is guilty of a Class F felony." Wis. Stat. § 940.23(2)(a). A Class F felony is punishable by "a fine not to exceed $25,000 or imprisonment not to exceed 12 years and six months, or both." Wis. Stat. § 939.50(3)(f).

¶ 73. The elements of *second*-degree reckless injury are spelled out in Wisconsin Jury Instructions—Criminal 1252. They are:

(1) The defendant caused great bodily harm to (name of victim); and

(2) The defendant caused great bodily harm by criminally reckless conduct.

121

¶ 74. The instruction explains that "criminally reckless conduct" means:

the conduct created a risk of death or great bodily harm to another person; and

the risk of death or great bodily harm was unreasonable and substantial; and

the defendant was aware that (his)(her) conduct created the unreasonable and substantial risk of death or great bodily harm.

Wis JI—Criminal 1252.

¶ 75. There is no suggestion that conduct "after the crime" is relevant to whether the defendant was "criminally reckless" or whether the defendant "caused" great bodily harm.

¶ 76. The statute on *first*-degree reckless injury is exactly the same as the statute on second-degree reckless injury *except* that it adds an element, namely, "under circumstances which show utter disregard for human life." Wis. Stat. § 940.23(1)(a). First-degree reckless injury is a Class D felony, meaning that it is punishable by "a fine not to exceed $100,000 or imprisonment not to exceed 25 years, or both." Wis. Stat. § 939.50(3)(d). In other words, first-degree reckless injury doubles the period of potential imprisonment and quadruples the potential fine over second-degree reckless injury, *if* the state is able to prove a third element: that the great bodily harm occurred "under circumstances which show utter disregard for human life."

¶ 77. To my mind, the clause "under circumstances which show utter disregard for human life" modifies the phrase "recklessly causes." If this is correct, conduct "*after* the crime" cannot be an element *of* "the crime." (Emphasis added.) The crime is complete when the defendant "recklessly causes" great bodily harm.

122

¶ 78. There might be a factual exception to this principle if the defendant fired multiple shots or inflicted multiple stab wounds or administered multiple blows to the victim, making it difficult to determine the effect and order of each individual wound, or if the injuries are considered together. But where, as here, there was a single gunshot and no other conduct contributed to the great bodily harm, the crime is complete when the gun is fired and great bodily harm is caused as a result.

¶ 79. The majority opinion holds that a defendant's conduct "after the crime" is to be evaluated the same as the defendant's conduct before and during the crime. The logical implication of this holding is that a Class F felony can be increased to a Class D felony by a defendant's callous or abhorrent conduct "after the crime"; or that a defendant's Class D felony can be decreased to a Class F felony by a defendant's "after the crime" mitigating conduct and remorse.

¶ 80. I can understand how a defendant's "after the crime" conduct could affect the defendant's sentence, but I cannot conceive of how a defendant's "after the crime" conduct could determine "the crime" itself.

¶ 81. The state may desire to use words or conduct "after the crime" to reinforce its view of the "circumstances" before and during the crime, but, in my view, words and conduct "after the crime" cannot increase the gravity of the crime.

¶ 82. A defendant may desire to mitigate "utter disregard" by his words and conduct after inflicting great bodily harm. However, such self-serving evidence should be unavailing.

¶ 83. Yogi Berra famously remarked, "It's never over till it's over." The majority opinion gives new meaning to Yogi's aphorism . . . at the expense of logic and order in the criminal law.

123

¶ 84. The majority opinion—to be blunt—deprives us of any certainty as to when the crime of first-degree reckless injury is complete.

¶ 85. Because the majority opinion is internally inconsistent, I respectfully concur in the result.

¶ 86. SHIRLEY S. ABRAHAMSON, C.J. (*dissenting*). I join the majority in reaffirming our previous decisions holding that when evaluating whether a defendant's conduct reflects utter disregard for human life, the factfinder should examine the totality of the circumstances, including all relevant conduct before, during, and after a crime. I disagree, however, with the majority's application of this rule of law to the jury instruction in the present case.

¶ 87. I conclude that the supplemental instruction was ambiguous and that Burris has shown that there is a reasonable likelihood that the instruction misled the jury about a critical element that distinguishes the charged crime from second-degree reckless injury.

¶ 88. During deliberations in the present case, the jury posed the following question to the circuit court about the jury instructions: "Regarding the element of utter disregard, all other facts and circumstances relating to the incident, do we consider facts and circumstances after the shooting?"

¶ 89. The jury's confusion about interpreting the instruction and determining what evidence it might consider is apparent from the question asked the circuit court.

¶ 90. Before the circuit court could answer this question, the jury posed another question in writing, again with regard to the element of utter disregard: "Should we consider facts and circumstances after the shooting in determining utter disregard?"

124

¶ 91. On the basis of our past cases interpreting the "utter disregard for human life" element and the majority decision today, the correct answer to each of the jury's questions was "yes." Instead of this simple affirmative response, the circuit court gave the jury a supplemental instruction, extracting an excerpt from *State v. Jensen,* 2000 WI 84, ¶ 32, 236 Wis. 2d 521, 613 N.W.2d 170. The following supplemental instruction is the basis for Burris's assertion that the jury instructions were confusing and misled the jury to apply the instruction in an unconstitutional manner:

> After-the-fact regard for human life does not negate "utter disregard" otherwise established by the circumstances before and during the crime. It may be considered by the factfinder as a part of the total factual picture, but it does not operate to preclude a finding of utter disregard for human life.[1]

¶ 92. The majority concludes that the circuit court's responding to the jury's question by giving the jury the *Jensen* supplemental instruction "was potentially ambiguous."[2]

¶ 93. I conclude that the circuit court's response *was* ambiguous. The *Jensen* supplemental instruction, taken out of the context of the *Jensen* case, is at odds with the "totality of the circumstances" approach reaffirmed by the majority today. The *Jensen* supplemental instruction language does not explain that the jury is to consider the totality of the circumstances, including Burris's actions before, during, and after the commission of the crime, in evaluating whether he acted with utter disregard for human life.

---

[1] *State v. Jensen,* 2000 WI 84, ¶ 32, 236 Wis. 2d 521, 613 N.W.2d 170.

[2] Majority op., ¶ 62.

¶ 94. I agree with the court of appeals that when "the *Jensen* language was read to the jury in answer to the question whether they could even *consider* after-the-fact actions, there is a reasonable likelihood that the jury interpreted the answer as suggesting that the trial court was implying that Burris's after-the-fact conduct was not important or compelling, that it should not be considered equally with other circumstances or that no amount of after-the-fact regard for human life could negate early behavior suggesting disregard for human life." *State v. Burris,* No. 2009AP956–CR, unpublished slip op., ¶ 32 (Wis. Ct. App. Jan. 26, 2010) (emphasis in original).

¶ 95. The majority opinion acknowledges that the *Jensen* language quoted in the supplemental jury instruction "was potentially ambiguous" when taken out of context.[3] The majority advises the Criminal Jury Instruction Committee to refrain from quoting *Jensen* out of context.[4] These statements are telling. If *Jensen's* language taken out of context does not have a reasonable likelihood of misleading the jury, then why does the majority issue this advisory?

¶ 96. The *Jensen* language was appropriate in the context of that case. The *Jensen* court applied a "sufficiency of the evidence" standard of review, a highly deferential standard.[5] In context, the quoted language from *Jensen* rejected Jensen's argument that his showing of some regard for human life after the crime should have precluded the jury's finding that he acted with utter disregard for human life.[6]

---

[3] Majority op., ¶ 62.

[4] Majority op., ¶ 64.

[5] *Jensen,* 236 Wis. 2d 521, ¶ 23.

[6] *Jensen,* 236 Wis. 2d 521, ¶¶ 30–32.

¶ 97. As the majority correctly points out, this language in *Jensen* should not be construed to mean that post-crime conduct is entitled to less weight than conduct before or during the crime.[7]

¶ 98. Yet, when taken out of context, the *Jensen* language "was potentially ambiguous," making it reasonably likely that the jury applied the supplemental instruction in an unconstitutional manner.

¶ 99. The *Jensen* supplemental instruction was misleading because it implied that if the jury were to find that Burris's conduct before and during the shooting showed utter disregard for human life, then a finding that he displayed some regard for human life after the shooting could not negate the finding of utter disregard. If the jury interpreted the instruction in this manner, then there is a reasonable likelihood that the jury was misled to believe that Burris's post-shooting conduct was either not entitled to weight or that it was entitled to less weight than his conduct before and during the shooting.

¶ 100. Thus, there is a reasonable likelihood that the jury instruction misled the jury into believing that the State did not have the burden of proving beyond a reasonable doubt that Burris exhibited utter disregard for human life under the totality of the circumstances, and instead only had the burden of proving Burris's actions before and during the commission of crime evinced utter disregard.

¶ 101. I agree with the majority that we must view the supplemental instruction in light of the proceeding as a whole, rather than in isolation.[8] The majority relies on the "extensive testimony" presented

---

[7] Majority op., ¶ 34.

[8] Majority op., ¶ 45

at trial regarding Burris's after-the-fact conduct, as well as the use of that conduct by counsel in closing arguments, to determine that Burris has not established a reasonable likelihood that the ambiguous instruction misled the jury into thinking it could not consider Burris's after-the-fact conduct in determining the "utter disregard for human life" element of the crime. Yet, as the majority states, after the "extensive testimony," the closing arguments, and the pattern jury instruction, "the jury was unsure whether it could consider after-the-fact conduct."[9]

¶ 102. Although the supplemental instruction was but one part of the entire proceeding, it is clear that the supplemental instruction muddled the law regarding an element of central importance to Burris's defense, an element the jury focused on and was confused about.

¶ 103. While the supplemental instruction may have been a correct statement of the law in the context of *Jensen,* I conclude that it was reasonably likely in the present case to confuse the jurors and cause them to apply the instruction in an unconstitutional manner because the *Jensen* language was taken out of its proper context.

¶ 104. For the reasons set forth, I dissent.

---

[9] Majority op., ¶ 62.