COURT OF APPEALS
DECISION
DATED AND FILED

December 12, 2023

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP1768-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2021CF12

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

JONATHAN P. MEDEIROS,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Buffalo County:  THOMAS W. CLARK, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Jonathan P. Medeiros appeals from a judgment convicting him of first-degree reckless homicide and from an order denying his

postconviction motion for resentencing. He claims that his trial counsel provided constitutionally ineffective assistance by failing to object to comments made by the prosecutor at sentencing—which Medeiros contends undermined the sentence recommendation bargained for in the plea agreement. We conclude that the prosecutor's comments did not breach the plea agreement and, therefore, his trial counsel did not provide ineffective assistance. Accordingly, we affirm the judgment and postconviction order.

## BACKGROUND

¶2    According to police reports cited in the complaint and the presentence investigation report (PSI), Medeiros called 911 to report that he had shot and killed his wife, Jolene.[1] Responding medical personnel discovered Jolene deceased with a shotgun wound to the head. During a police interview, Medeiros stated: "I stood up out of bed, grabbed a shotgun, and fucking shot once. She was screaming at me, going ape shit screaming at me, and I shot again." At various points during the interview, Medeiros stated that he had aimed the shotgun at Jolene's chest, but that he had never intended to shoot her. When asked why he had shot Jolene, however, Medeiros responded that she "just kept bitching." Medeiros further stated that he and Jolene had been drinking and arguing all day. Medeiros also acknowledged during the interview that he had threatened to kill Jolene about six months prior to the shooting and he had, in recent weeks, threatened to burn down the house he and Jolene shared if Jolene tried to kick him out.

---

[1] Although Medeiros referred to the victim as his wife in his 911 call, he later explained that the two were not "legally married" but considered themselves to be married.

¶3      Based on these allegations, the State initially charged Medeiros with first-degree intentional homicide.   The parties eventually reached a plea agreement, whereby Medeiros agreed to waive his right to a trial and pled guilty to a reduced charge of first-degree reckless homicide, while the State agreed to recommend a sentence of twenty-five years' initial confinement followed by fifteen years' extended supervision.

¶4      Before ultimately allowing the Information to be amended and accepting the plea, the circuit court questioned the State as to why the reduced charge was appropriate, and it inquired as to the position of Jolene's family.  The State responded that Medeiros's consumption of alcohol, the fight between Medeiros and Jolene, and Medeiros's denial of intent to kill Jolene could "mitigate" the intent element of intentional homicide.  The State also explained that Jolene's family did not want to go through a trial.

¶5      The PSI included additional information from family members of both Jolene and Medeiros, a neighbor, and other friends and coworkers of Jolene's about Medeiros's possessive and abusive behavior toward Jolene and his repeated threats to kill Jolene.   The neighbor said that, about three weeks before the shooting, she and Jolene "had devised a safety plan for Jolene in order to hide or get away if she needed it."  One of the coworkers described a time when Jolene's mother had removed the guns from the home Jolene shared with Medeiros because Medeiros had been drinking and threatening to kill Jolene.

¶6      At the sentencing hearing, the prosecutor recommended a sentence of twenty-five years' initial confinement followed by fifteen years' extended supervision, as the State had agreed to do.  The prosecutor stated that he had conferred with the family, law enforcement, and other prosecutors, who all agreed

that the proposed sentence would be a "just resolution," and the prosecutor further noted that nothing in the PSI altered his belief that the recommendation was appropriate. The prosecutor reiterated that because the State would have had to prove intent at trial and the family did not want to go to trial, he had agreed to reduce the charge to "reckless endangerment [sic] which, of course, the [c]ourt understands is a possibility of a 60-year prison sentence."

¶7      While discussing Medeiros's character, the prosecutor noted that Medeiros's acceptance of responsibility—by entering a plea—was "somewhat muted by the fact that if [the matter] had gone to trial and [the State had] won … [Medeiros] would have faced a mandatory life imprisonment." The prosecutor then commented that the "hard part" of the case for him was that Medeiros had told Jolene on more than one occasion that he was going to kill her and then "carried through with his threat to kill her." The prosecutor characterized Medeiros's conduct as "the ultimate act of domestic violence" evincing a "depraved mind, which goes to the character of the offender and the rehabilitative needs." The prosecutor suggested that Medeiros would "need extensive rehabilitation for the thinking that [led him] to the conclusion that" he had the right to take the life of the woman he professed to love because she did not do what he wanted her to do.

¶8      As to the gravity of the offense, the prosecutor observed that, generally, there are no more serious crimes than homicides and he then noted that the shooting here was selfish, senseless, and deprived two children of their mother, as well as two parents of their daughter. As part of his discussion of the impact of Jolene's death, the prosecutor also made reference to a letter from one of Jolene's friends, who asked the circuit court to impose a life sentence.

¶9 The prosecutor next opined that the recommendation in the PSI for twenty years' initial confinement followed by ten years' extended supervision would be insufficient to protect the public because it underestimated the risk that Medeiros would engage in future violence. The prosecutor pointed out that twenty-five years of initial confinement would put Medeiros into his sixties when he was released to extended supervision, by which age the prosecutor believed Medeiros's dangerousness would have decreased "significantly." The prosecutor concluded that a forty-year total sentence was justified to protect the public from "somebody who had essentially executed his significant other because she wouldn't shut up."

¶10 Medeiros asked the circuit court to follow the thirty-year total sentence recommended in the PSI. Ultimately, the court rejected the recommendations of both the parties and the PSI, and it imposed a sentence consisting of thirty years' initial confinement followed by twenty years' extended supervision.

¶11 Medeiros filed a postconviction motion seeking resentencing. He alleged that his trial counsel provided ineffective assistance by failing to object to several of the prosecutor's comments as breaching the plea agreement. The circuit court denied the motion following an evidentiary hearing, and Medeiros appeals.

**DISCUSSION**

¶12 A defendant raising a claim of ineffective assistance of counsel must prove: (1) deficient performance by counsel; and (2) prejudice resulting from that deficient performance. *State v. Sholar*, 2018 WI 53, ¶32, 381 Wis. 2d 560, 912 N.W.2d 89. We will not set aside the circuit court's factual findings about what actions counsel took or the reasons for them unless they are clearly erroneous. *See*

*State v. Balliette*, 2011 WI 79, ¶19, 336 Wis. 2d 358, 805 N.W.2d 334. However, whether counsel's conduct violated the constitutional standard for effective assistance is ultimately a legal determination that this court decides de novo. *Id.* We need not address both elements of the test if the defendant fails to make a sufficient showing on one of them. *State v. Swinson*, 2003 WI App 45, ¶58, 261 Wis. 2d 633, 660 N.W.2d 12.

¶13 In order to demonstrate deficient performance, a defendant must overcome a presumption that counsel's actions fell within a wide range of professional conduct. *Strickland v. Washington*, 466 U.S. 668, 689 (1984). Counsel does not perform deficiently by failing to bring a meritless motion. *State v. Sanders*, 2018 WI 51, ¶29, 381 Wis. 2d 522, 912 N.W.2d 16. Here, we conclude that counsel did not perform deficiently by failing to object to a breach of the plea agreement because the State did not, in fact, breach the plea agreement.

¶14 When a defendant agrees to enter a plea in reliance upon the State's promise to perform a future act, the defendant has a due process right to fulfillment of the bargain. *State v. Williams*, 2002 WI 1, ¶37, 249 Wis. 2d 492, 637 N.W.2d 733. The State's deviation from a plea agreement constitutes an actionable breach, however, only when the deviation both "violates the terms of the agreement and deprives the defendant of a material and substantial benefit for which he or she bargained." *State v. Bowers*, 2005 WI App 72, ¶9, 280 Wis. 2d 534, 696 N.W.2d 255. We will uphold factual findings regarding the terms of the plea agreement and the prosecutor's conduct unless they are clearly erroneous, but we will independently determine whether the conduct constitutes a substantial and material breach of the plea agreement. *Williams*, 249 Wis. 2d 492, ¶20.

¶15     The State's failure to accurately present a negotiated sentencing recommendation to the circuit court constitutes a violation of the plea agreement. *Id.*, ¶38. Additionally, the State "may not render less than a neutral recitation of the terms of the plea agreement" by expressing reservations about it. *State v. Poole*, 131 Wis. 2d 359, 364, 394 N.W.2d 909 (Ct. App. 1986). Nor may the State make an end run around a plea agreement by "covertly convey[ing] to the [circuit] court that a more severe sentence is warranted than recommended." *State v. Hanson*, 2000 WI App 10, ¶24, 232 Wis. 2d 291, 606 N.W.2d 278 (1999). At the same time, public policy requires that the State be able to present relevant information to the sentencing judge. *Williams*, 249 Wis. 2d 492, ¶43. Thus, a prosecutor is free to discuss negative information about the defendant that has come to light after the plea agreement and before sentencing, as long as the prosecutor does not imply that the State would not have entered into the plea agreement if it had known the additional information. *Id.*, ¶50.

¶16     Here, Medeiros contends that the State undermined its negotiated sentence recommendation by: (1) highlighting Medeiros's prior threats to kill Jolene, suggesting the homicide was intentional; (2) reminding the circuit court that it could impose the sixty-year maximum; (3) noting that Medeiros would have faced a mandatory life sentence if he had been convicted of the original charge at trial; and (4) referring to the letter from one of Jolene's friends requesting that the court impose a life sentence. Medeiros argues that these comments by the prosecutor collectively "cast doubt on both the legitimacy of the amended charge as well as the appropriateness of the 40-year recommendation, thereby depriving Medeiros of the benefit of his bargain." We strongly disagree with Medeiros's characterizations of the prosecutor's comments.

¶17    First, the prosecutor's references to Medeiros's repeated threats to kill Jolene were consistent with a charge of first-degree reckless homicide. First-degree reckless homicide occurs when a person "recklessly causes the death of another human being under circumstances which show utter disregard for human life." WIS. STAT. § 940.02(1) (2021-22). The term "utter disregard for human life" is interpreted consistently with previous interpretations of the "depraved mind" element that it replaced. *State v. Jensen*, 2000 WI 84, ¶18, 236 Wis. 2d 521, 613 N.W.2d 170.   As the Supreme Court of Wisconsin has explained:

> To constitute a depraved mind, more than a high degree of negligence or recklessness must exist.  The mind must not only disregard the safety of another but be devoid of regard for the life of another.…  A depraved mind lacks a moral sense, an appreciation of life, is unreasonable and lacks judgment.  A depraved mind has a general intent to do the acts and the consciousness of the nature of the acts and possible result but lacks the specific intent to do the harm.

*State v. Weso*, 60 Wis. 2d 404, 411-12, 210 N.W.2d 442 (1973).  In analyzing whether a defendant acted with utter disregard for human life, the fact finder examines the totality of the circumstances, including the time before, during, and after the crime.  *State v. Burris*, 2011 WI 32, ¶¶38-39, 41, 333 Wis. 2d 87, 797 N.W.2d 430.

¶18    Placing the shooting in the context of a domestic abuse pattern in which Medeiros made repeated threats against Jolene's life underscored the fact that Medeiros had acted with more than mere recklessness.  The prior threats tended to show that Medeiros acted with a general intent to fire the gun toward Jolene without an appreciation for her life, even if he lacked a specific intent to kill her, as he claimed.  The prosecutor's references to the prior threats therefore

supported his stated conclusion that Medeiros's conduct evinced a "depraved mind"—a term historically associated with first-degree reckless homicide, not intentional homicide.

¶19 Second, we do not view the prosecutor's reference to the "possibility" that the circuit court could impose a sixty-year sentence as a recommendation—either direct or covert—that the court do so. The prosecutor was merely stating the maximum available penalty for the charge on which the court was about to sentence Medeiros.

¶20 Third, the prosecutor's reference to the mandatory life sentence Medeiros would have received if he had been convicted of the original charge at trial was plainly made in the context of describing Medeiros's motivation for entering into the plea agreement. The information was relevant to evaluating the degree to which Medeiros truly accepted responsibility for his actions and, in turn, his continuing need for rehabilitation.

¶21 Fourth, the prosecutor's reference to a letter asking the circuit court to impose a life sentence was made in the context of describing the impact that Jolene's death had on her family and friends. Merely referring to another person's recommendation does not breach a plea agreement, however. *State v. Duckett*, 2010 WI App 44, ¶10, 324 Wis. 2d 244, 781 N.W.2d 522. This was not a situation such as that in *Williams*, where the prosecutor's reference undercut the State's recommendation. *See generally Williams*, 249 Wis. 2d 492. Rather, the prosecutor offered the information as relevant to the severity of the offense, in support of its recommendation.

¶22 Moreover, the prosecutor did not merely cite the State's negotiated sentence recommendation—he actively advocated for it throughout his argument

to the circuit court. In particular, the prosecutor noted that the recommendation had been endorsed by Jolene's family, law enforcement, and other prosecutors, and he characterized it as "just." In this context, we do not view any of the prosecutor's comments as an invitation to impose a higher sentence than the one the State was recommending. We therefore agree with the circuit court's conclusions that the State did not breach the plea agreement and that Medeiros has no grounds for his claim of ineffective assistance of counsel.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5. (2021-22).