COURT OF APPEALS
DECISION
DATED AND FILED

February 18, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.**  **2022AP1480-CR**

Cir. Ct. No. 2019CF764

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

---

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

CLIFFORD LEE KELSEY,

DEFENDANT-APPELLANT.

---

APPEAL from a judgment and an order of the circuit court for Brown County: TIMOTHY A. HINKFUSS, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Clifford Kelsey appeals from a judgment of conviction, entered upon a jury's verdict, for repeated sexual assault of a child in

violation of WIS. STAT. § 948.025(1)(b) (2021-22).[1] He also appeals from an order denying his motion for postconviction discovery and relief. On appeal, Kelsey renews several challenges to his trial counsel's effectiveness and argues that the circuit court erred by denying his postconviction motion for discovery of records pertaining to some of the State's witnesses at trial. For the reasons that follow, we affirm.

## BACKGROUND

¶2      The State charged Kelsey with one count of repeated sexual assault of a child, Anna.[2] The State alleged that Kelsey had sexually assaulted Anna at least three times between September 2018 and June 2019. The case eventually proceeded to a jury trial.

¶3      At trial, the State presented several witnesses, including Anna, and played for the jury an audiovisual recording of Anna's forensic interview that occurred shortly after Anna disclosed the sexual assaults to her mother, Willa. Although there were some discrepancies between the forensic interview and Anna's trial testimony, Anna's accusations were largely consistent. For example, Anna testified at trial that Kelsey had, on approximately eight occasions, "put his private part in [her] mouth." Similarly, Anna stated in the forensic interview that she was forced to "suck" Kelsey's "dick" eight times. Anna testified that Kelsey had touched her "by the private part and the breasts," which, again, matched statements she made during the forensic interview. Anna also described, both at trial and in the

---

[1] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2] Pursuant to the policy underlying WIS. STAT. RULE 809.86, we use pseudonyms to refer to the victim and her mother. We use the same pseudonyms adopted by the parties on appeal.

forensic interview, that Kelsey had moles on his penis, which Willa corroborated at trial.

¶4    In addition, the State called a nurse practitioner, Jennifer Yates, to testify. Yates stated that she performed a medical evaluation of Anna shortly after Anna's forensic interview. Yates testified that she did not find any physical signs of sexual abuse during her examination but that she would not have expected to find any signs of abuse because the "majority of victims of sexual abuse … have normal or nonspecific anal-genital exams which can be due to lack of injury associated with many forms of sexual abuse and/or rapid and complete healing." Yates stated that less than five percent of sexual abuse victims have physical signs of abuse and that "the research supports this too that even young girls who are pregnant often have no genital injury."

¶5    On cross-examination, Kelsey's trial counsel asked Yates to identify the specific research to which she had referred. Yates then named three specific studies, one of which examined over 2,000 children "evaluated for sexual abuse concerns." Yates then confirmed that her "medical diagnosis" of Anna was that there was "suspected child abuse." However, Yates conceded that she only made that diagnosis because she was informed that Anna was sexually abused and that she issues that diagnosis in "all cases where there's suspected child sexual abuse," even where there are no physical signs of abuse.

¶6    Raechel Garbisch, a Brown County Child Protective Services (CPS) employee, also testified. Garbisch stated that she responded to Willa's home after receiving information from law enforcement regarding Anna's allegations. On cross-examination, Garbisch testified that she had prepared a report based on her investigation and that part of the report outlined the family's history. Included in

that history was a prior CPS investigation in 2018, which stemmed from "unsubstantiated" allegations that Kelsey had physically abused Anna. Garbisch testified that as part of the 2018 investigation, she referred Anna and Willa for counseling. Garbisch also stated that as part of the 2018 investigation, Anna informed her that she was not fearful of Kelsey and he had not physically abused her.

¶7 Kelsey's trial counsel asked Garbisch, "Why did you indicate in the report that … [Willa] was having a child make accusations of sexual abuse that weren't true?" This question was a reference to a 2007 incident in Florida, outlined in the report, in which Willa and another individual allegedly coached one of her children—not Anna—to accuse her then-boyfriend of sexual abuse. Over the State's objection, the circuit court permitted counsel to pursue questions related to the 2007 incident and any other instances mentioned in the report. Garbisch responded to counsel's question, stating that she did not have any personal knowledge of the 2007 incident, that she simply retrieved the family's history from CPS records, and that she had no way of knowing if the allegations stemming from the 2007 incident were true.

¶8 Willa testified that she was in a romantic relationship with Kelsey during the relevant time period. Willa stated that in June 2019, Anna informed her that Kelsey had, among other things, "touch[ed] [Anna] inappropriately," "put his thing in her mouth," and "sucked on her chest." Willa denied that she had ever coached one of her children to accuse another individual of sexual abuse, and she claimed that she was cleared of any wrongdoing related to the 2007 incident. On cross-examination, Kelsey's trial counsel asked Willa whether she was "aware that the conclusion" by CPS was that she and another individual had coached one of her

children "to believe that she had been sexually abused." Willa again stated that she thought CPS had cleared her of wrongdoing.

¶9 Kelsey testified in his own defense. He denied sexually assaulting Anna and claimed that she was accusing him because he had threatened to have Willa and Anna leave his residence.

¶10 Following the close of evidence, the circuit court read the jury a list of instructions approved by the parties. As is pertinent here, the court read the jury the State's proposed instruction for repeated sexual assault of a child. The instruction stated, "Before you may find the defendant guilty, you must unanimously agree that at least three sexual assaults occurred" between the relevant dates, "but you need not agree on which acts constitute the required three." The jury returned a guilty verdict.

¶11 After sentencing, Kelsey filed a motion for postconviction relief. He argued that his trial counsel was constitutionally ineffective by failing to: (1) investigate and introduce "exculpatory evidence"; (2) adequately cross-examine Yates; and (3) object to the circuit court's use of the State's proposed jury instruction for repeated sexual assault of a child. Kelsey further argued that he was entitled to a new trial because the aforementioned jury instruction denied him the right to a unanimous verdict and violated his right to due process. Lastly, Kelsey asserted that he was entitled to postconviction discovery of Anna's school records, additional CPS records, and Willa's medical and criminal history records.

¶12 The circuit court held a ***Machner***[3] hearing, after which it issued a written decision and order denying Kelsey's claims of ineffective assistance of

---

[3] *See **State v. Machner***, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

counsel related to trial counsel's alleged failure to investigate and adequately question Yates. The court stated that because it denied the ineffective assistance of counsel claims, it was also denying Kelsey's claim for postconviction discovery. In addition, the court determined that the applicable jury instruction was not erroneous, and it therefore denied both of Kelsey's remaining ineffective assistance of counsel claim and his claim that he was entitled to a new trial on jury unanimity or due process grounds. Kelsey now appeals.

## DISCUSSION

### I. Ineffective assistance of counsel

¶13   To demonstrate that counsel was ineffective, a defendant must prove both that counsel's performance was deficient and that the deficient performance was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "If the defendant fails to satisfy either prong, we need not consider the other." *State v. Breitzman*, 2017 WI 100, ¶37, 378 Wis. 2d 431, 904 N.W.2d 93.

¶14   "To establish that counsel's performance was deficient, the defendant must show that it fell below 'an objective standard of reasonableness.'" *Id.*, ¶38 (citation omitted). "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. "[T]here is a strong presumption that trial counsel's conduct 'falls within the wide range of reasonable professional assistance,'" and "[c]ounsel's decisions in choosing a trial strategy are to be given great deference." *Breitzman*, 378 Wis. 2d 431, ¶38 (second alteration in original; citation omitted). We "will not second-guess a reasonable trial strategy, [unless] it was based on an irrational trial tactic or based upon caprice rather than upon judgment." *Id.*, ¶65 (alteration in original; citation omitted). "In fact, where a lower court determines

that counsel had a reasonable trial strategy, the strategy 'is virtually unassailable in an ineffective assistance of counsel analysis.'" *Id.* (citation omitted).

¶15    "To establish that deficient performance was prejudicial, the defendant must show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.*, ¶39 (citation omitted).

¶16    "Whether a defendant was denied effective assistance of counsel is a mixed question of law and fact." *Id.* "The factual circumstances of the case and trial counsel's conduct and strategy are findings of fact, which will not be overturned unless clearly erroneous; whether counsel's conduct constitutes ineffective assistance is a question of law, which we review de novo." *Id.*

A. Trial counsel's failure to investigate incidents and records underlying the CPS report and Anna's school records

¶17    Kelsey argues that his trial counsel was ineffective by not conducting independent investigations to uncover evidence to support Kelsey's defense. Specifically, Kelsey asserts that his counsel should have independently investigated incidents referenced in the CPS report, including the 2018 investigation and the 2007 incident. Kelsey argues that "there was no harm in pursuing [an] investigation" into the 2007 incident because if his counsel "had done the investigation and found helpful and harmful information, counsel could have made a strategic decision about presenting the evidence … and triggering the need for disclosure." Kelsey further contends that his counsel should have investigated Anna's school records. According to Kelsey, his counsel's decision not to investigate these records was unreasonable because an independent investigation

would have enabled counsel "to show that what Kelsey said was credible and what Willa and Anna said was [incredible]."

¶18    At the ***Machner*** hearing, Kelsey's trial counsel testified that he did not interview Garbisch or any witnesses named in the CPS report, except for Kelsey, and he did not request additional CPS records. Regarding the 2018 incident, counsel conceded that the CPS report did not state who made the allegation of physical abuse against Kelsey, and he did not independently determine prior to trial who made that allegation.[4]

¶19    However, Kelsey's trial counsel stated that he intentionally avoided any investigation into the contents of the CPS report because he "had what [he] wanted" and conducting further investigation would have "opened a can of worms." Counsel testified that he was concerned that further investigation into the 2007 and 2018 incidents would have required the defense to either file pretrial motions—which would result in the circuit court conducting an in camera inspection of *all* CPS records—or turn over discovered records to the State. Counsel was concerned that some of these records would be beneficial to the State, either because they would have made Anna "more of a sympathetic alleged victim," painted Kelsey in a negative light, or provided the State with potential other-acts evidence.

¶20    For example, Kelsey's trial counsel recalled that Kelsey was previously in court in a civil matter that "involved neglect of … these children." Counsel also referred to another incident described in the CPS report where, in 2017, Kelsey reportedly hung Anna from a door using an article of clothing. Moreover,

---

[4] After trial, the parties agreed that Anna made the accusation of physical abuse against Kelsey.

counsel recalled a conversation with Kelsey in which Kelsey himself warned counsel that "there would be reports that would not be of help to" the defense.

¶21     In addition, Kelsey's trial counsel stated that he did not want to alert the State that the defense was going to attempt to admit information from the CPS report relating to the 2007 incident.  Counsel testified that his "analysis" was that if he filed pretrial motions attempting to admit the 2007 incident, "there was going to be … this whole other-acts analysis or whatever the research would have showed," which would have provided the State "a better opportunity" to prepare and attempt to exclude the evidence.

¶22     Furthermore, Kelsey's trial counsel testified that part of his trial strategy was to show that there was a significant time period of two days between Anna's disclosure and her forensic interview, during which time Anna was influenced through various conversations with adults—namely, two teachers and a school social worker—and was able to "master[]" a version of the accusations.  For example, police reports show that Anna met with the school social worker immediately prior to her forensic interview.  Anna testified at trial that she also spoke with at least one of her teachers about the sexual assaults.

¶23     Kelsey's trial counsel testified that he did not ask the State for information about those meetings and did not attempt to obtain records from Anna's school.  Counsel stated, however, that he did not want individuals who met with Anna prior to the forensic interview to testify at trial.  He feared those individuals would inform the jury that they were "specialized in talking to children," and, therefore, the jury may have been more likely to believe that they had Anna's best interests in mind.  Counsel further testified that he did not want to obtain information from the school records that he would have had to turn over to the State.

¶24     The circuit court determined that Kelsey had failed to meet his burden of proving that his trial counsel performed deficiently by failing to conduct an independent investigation into the aforementioned records because counsel's trial strategy, as testified to at the ***Machner*** hearing, was reasonable. In particular, the court credited counsel's testimony that he did not want to alert the State "to the possibility of consistent reporting from the victim" through discovery mandates. Likewise, the court found that counsel aptly determined that "investigations into other witnesses and documents may inevitably lead to the discovery of evidence that would be damaging to Kelsey's credibility at trial instead of bolstering it."[5] For example, the CPS report contained other allegations against Kelsey that were not mentioned at trial, and counsel was appropriately concerned that additional records would have "generate[d] sympathy" for Anna. Moreover, the court found that counsel reasonably undertook a strategy by which he, over the State's objection, was able to introduce the 2007 incident into evidence without previously alerting the State.

¶25     We likewise conclude that Kelsey's trial counsel did not perform deficiently by failing to conduct an independent investigation into the records because such an approach was strategic, deliberate, and—most importantly—reasonable. Stated differently, "irrespective of whether we … view that strategy as the best," we cannot conclude that counsel's strategic decision not to investigate the records deprived Kelsey of the right to constitutionally effective assistance. *See **State v. Marks***, 2010 WI App 172, ¶17, 330 Wis. 2d 693, 794 N.W.2d 547.

---

[5] In its written decision and order, the circuit court adopted the State's brief in opposition to Kelsey's motion for postconviction relief.

10

¶26 Prior to trial, Kelsey informed his trial counsel that additional CPS records would not be beneficial to the defense and would portray Kelsey in a negative light.[6] Armed with this knowledge and the CPS report, counsel reasonably determined that independently investigating additional CPS records would "open[] a can of worms." *See State v. Leighton*, 2000 WI App 156, ¶40, 237 Wis. 2d 709, 616 N.W.2d 126 ("Counsel's failure to pursue certain investigations may not be challenged later as unreasonable when the defendant has given counsel the reason to believe that pursuing those investigations would be fruitless.").

¶27 Kelsey's trial counsel knew that he would need to disclose to the State any relevant evidence that he intended to present at trial. *See* WIS. STAT. § 971.23(2m). Thus, counsel was concerned that if he wanted to introduce any *helpful* information into evidence, he would have had to first tip off the State to the fact that such evidence existed. Counsel stated that this disclosure, in turn, would cause the State to investigate and introduce the potentially *harmful* portions of the records into evidence.

¶28 Indeed, the CPS report identified other prior incidents of abuse against Anna, including uncharged allegations made against Kelsey, which were never introduced at trial. In addition to the potential for harmful evidence that could have diminished Kelsey's credibility, Kelsey's trial counsel was worried that the

---

[6] Without proper citation to the record, Kelsey states on appeal that he testified at the *Machner* that "there was nothing harmful to him in the CPS records." Upon our review of the record, it appears that Kelsey testified that he did not recall telling his trial counsel that there would be harmful reports in the records. Regardless, the circuit court adopted the State's brief in opposition to Kelsey's postconviction motion, in which the State relied on Kelsey's statement to his counsel as testified to by counsel. *See State v. Quarzenski*, 2007 WI App 212, ¶19, 305 Wis. 2d 525, 739 N.W.2d 844 (stating that if a circuit court does not make express findings with regard to witness credibility, we will generally assume that the court "made implicit findings on a witness's credibility when analyzing the evidence"). The court's implicit credibility finding regarding Kelsey's statement to counsel is not clearly erroneous.

evidence would also harm the defense by painting a picture for the jury that Anna grew up in a less-than-desirable parenting situation, potentially causing the jury to have more sympathy for her. Further, counsel was reasonably concerned that the teachers' and social worker's testimony would be more harmful than beneficial. That is, even if there were some benefit in calling those witnesses, that benefit would be outweighed by virtue of their professions and any implication that they believed Anna's accusations were true. We also note that there is no indication in the record that Anna's conversations with the teachers or the social worker were recorded. Thus, any inconsistencies in the reports created by those individuals would not, in all likelihood, have been given the same amount of weight as the forensic interview. In the circuit court's words, "[t]he [forensic] interview … was what mattered."

¶29 Additionally, Kelsey's trial counsel was able to maintain an element of surprise over the State by not informing it that the defense would seek to introduce the 2007 incident through the CPS report, which the State had disclosed through discovery. Over the State's objection, counsel was permitted to ask both Garbisch and Willa about the 2007 incident. Although Willa denied culpability and counsel was unable to impeach her with actual records from 2007, counsel stated that he "expected" Willa to deny responsibility and he felt that she "came across" as unreliable to the jury. Counsel further stated that he "had accomplished what it was that [he] wanted to accomplish" by using the CPS report. That is, counsel provided a theory to the jury that Willa's testimony contradicted what was in the CPS report, that there were reports of Willa previously coercing one of her children to accuse a man of sexual abuse, and that Willa could be doing the same to Anna and Kelsey. In his closing argument, counsel speculated that if Willa had previously coached a child into making a false accusation, it could have happened to Anna in

12

this case. Counsel further stated, "Don't forget the Florida incident. Don't forget that this isn't beyond [Willa] … to coach a child to make such an accusation."

¶30 Likewise, Kelsey's trial counsel was able to suggest to the jury—without Anna's school records or the testimony of school staff—that there was a significant time period between the alleged sexual assaults in this case and Anna's forensic interview, during which time adults had influence over Anna's story. In his opening statement, counsel warned the jury to listen for "how many different people" Anna informed of the accusations prior to her forensic interview. Counsel then instructed the jury to "ask yourselves whether or not there has been this subtle implantation in [Anna's] mind as to what supposedly occurred." Consistent with counsel's theory, the jury heard evidence that Anna spoke with multiple adults prior to her forensic interview and that each of these conversations was about the accusations. Similarly, in his closing argument, counsel suggested that "the evidence has been compromised" "in the sense that the disclosure has gone through how many individuals and adults" prior to the forensic interview. Counsel stated that Anna was now testifying "after having gone through all of these different adults and after retelling her … story and being implanted in her throughout what that story is."

¶31 In short, Kelsey's trial counsel deliberately decided not to investigate the records further outside of what the State provided in discovery. Although there were disadvantages to this strategy, counsel reasonably determined that those disadvantages were outweighed by the advantages of not independently investigating the records. As explained above, counsel's strategy prevented the State from introducing potential harmful evidence at trial, permitted the defense to have the element of surprise, and allowed the defense to pursue its theory that Kelsey was innocent and that Anna was impermissibly influenced in making her

accusations. Thus, Kelsey failed to demonstrate that counsel's strategy was unreasonable, and counsel's representation was not deficient.

¶32    Citing *State v. Thiel*, 2003 WI 111, 264 Wis. 2d 571, 665 N.W.2d 305, and *State v. Stroik*, 2022 WI App 11, 401 Wis. 2d 150, 972 N.W.2d 640, Kelsey contends that when the credibility of a witness is paramount to a case, it is objectively unreasonable for defense counsel not to pursue further evidence to impeach that witness. However, neither *Thiel* nor *Stroik* stands for the proposition that in every so-called "credibility contest," defense counsel must undertake all potential investigations into a witness's credibility. While both cases held that the defense attorneys performed deficiently by failing to conduct reasonable investigations, the attorneys did not articulate reasonable decisions that would have made the particular investigations unnecessary. *See Thiel*, 264 Wis. 2d 571, ¶46; *Stroik*, 401 Wis. 2d 150, ¶¶59-62; *Strickland*, 466 U.S. at 691 ("[C]ounsel has a duty to make reasonable investigations *or to make a reasonable decision that makes particular investigations unnecessary*." (emphasis added)).

¶33    Here, Kelsey's trial counsel testified that he had a trial strategy that made further investigation unnecessary. For reasons that we have already articulated, that strategy was reasonable. Moreover, it permitted counsel to question Anna's and Willa's credibility and also present evidence suggesting, as part of the defense's theory, that the allegations against Kelsey may have been fabricated. As such, counsel did not perform deficiently by failing to independently investigate incidents referenced in the CPS report and Anna's school records.

B. Trial counsel's failure to impeach Willa with her criminal history

¶34    Kelsey next asserts that his trial counsel was ineffective for failing to "impeach Willa with proof of her prior felony child abuse conviction" from Florida.

Prior to Willa's trial testimony, counsel stated that his understanding was that Willa had no convictions. Contrary to that belief, the CPS report stated that, in 2002, Willa "was found [g]uilty and convicted of 3rd degree felony [c]ruelty toward [a] child—child abuse, abuse without great harm." The CPS report also stated that, in 2002, Willa was convicted of "DUI alcohol or drugs." The State corrected counsel, stating that Willa had two Florida convictions from 2003. Counsel conceded at the *Machner* hearing that he did not ask Willa at trial whether she had previously been convicted of a crime.

¶35 We assume without deciding that the fact of Willa's convictions would have been admissible under WIS. STAT. § 906.09. Even with that assumption in mind, we agree with the State that any deficient performance by Kelsey's trial counsel in not eliciting the number of Willa's convictions at trial did not prejudice Kelsey's defense.

¶36 Kelsey is correct that "[a] prior conviction on any crime is relevant to the credibility of a witness's testimony," and "[o]ur law presumes that a person who has been convicted of a crime is less likely to be a truthful witness than a person who has not been convicted." *See State v. Kruzycki*, 192 Wis. 2d 509, 524, 531 N.W.2d 429 (Ct. App. 1995). However, there was a plethora of evidence admitted at trial that provided a basis for the jury to question Willa's credibility.

¶37 For instance, the jury heard that Willa had a substance abuse problem, that CPS employees recommended in 2018 that she attend counseling, and that she was accused in Florida of coaching one of her children into accusing an individual of sexual abuse. In fact, a detective who investigated Anna's accusations against Kelsey testified that her first impression of Willa was that "she was a mess" and that "she was under the influence of something." The State echoed the detective's

15

testimony in its closing argument, stating that "[t]here is no question at all that [Willa] is a mess.… [T]he State didn't try to hide that from you."

¶38    Accordingly, even if the jury had been informed of the number of Willa's prior convictions, there is not a reasonable probability that the result of the trial would have been different.

C. Trial counsel's failure to introduce other evidence

¶39    Kelsey also asserts that his trial counsel was ineffective because he failed to use certain evidence provided in discovery—specifically, the forensic interview of one of Kelsey and Willa's children—to impeach Willa by showing that Kelsey provided the children a ride to school the Monday after he was accused of sexually assaulting Anna. Kelsey argues that this evidence contradicts Willa's testimony that she observed Kelsey get arrested two days earlier on Saturday and that he did not drive the children to school on Monday.

¶40    In response, the State contends that the "contradictions were minor, particularly given how generally unreliable" Willa came across at trial. The State further argues that the evidence would have been cumulative because Anna also stated in her forensic interview, which was played for the jury, that Kelsey drove her to school on Monday.

¶41    Kelsey failed to address the State's arguments in his reply brief, and we therefore deem him as conceding this issue. *See United Coop. v. Frontier FS Coop.*, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578. Regardless, even if not conceded, the facts show that Kelsey's trial counsel was not deficient because evidence that Kelsey gave the children a ride to school that morning was indeed already before the jury. Kelsey testified to that fact, and the State introduced

corroborating evidence to the jury through Anna's forensic interview recording. Additionally, we agree with the State that the distinction between whether Kelsey gave the children a ride to school was inconsequential to the question of whether Kelsey sexually assaulted Anna.

D. Trial counsel's failure to adequately cross-examine the nurse practitioner

¶42    Kelsey further argues that his trial counsel provided ineffective assistance because he was "unprepared" to question Yates, the nurse practitioner, and elicited harmful testimony that Yates "diagnos[ed]" Anna with "suspected child abuse."

¶43    However, Kelsey's trial counsel was never questioned at the *Machner* hearing about his cross-examination of Yates. We could deny Kelsey's claim on this ground.[7] *See State v. Machner*, 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979) ("It is a prerequisite to a claim of ineffective representation on appeal to preserve the testimony of trial counsel. We cannot otherwise determine whether trial counsel's actions were the result of incompetence or deliberate trial strategies.").

¶44    Even so, we agree with the State that Kelsey's trial counsel did not perform deficiently in his cross-examination of Yates. Counsel's question about Anna's "diagnosis" led to Yates conceding that she makes that diagnosis in "all cases where there's suspected child sexual abuse," regardless of whether there is any physical evidence of sexual assault and the accused denies the allegation. In counsel's closing argument, he proposed to the jury that "the system" is structured

---

[7] Additionally, Kelsey failed to address in his reply brief the State's argument that he failed to preserve his trial counsel's testimony on this issue, and we could conclude on an alternative basis that he conceded this argument. *See United Coop. v. Frontier FS Coop.*, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578.

in a fashion in which the State, including law enforcement and CPS, assume that children who report sexual assaults are telling the truth because "[t]hat is the safest approach."

¶45    According to Kelsey's trial counsel, this approach "reward[s]" accusers who are children.  Counsel specifically mentioned Yates' testimony during his closing argument, stating that Yates was "yet another adult who's going to reaffirm what [Anna] has said."  Thus, it appears that counsel had a strategy of attacking the integrity of the investigation into Anna's accusations, including Yates' evaluation.  This strategy clearly "falls within the wide range of reasonable professional assistance," and counsel was not deficient by pursuing it. *See Strickland*, 466 U.S. at 689.

E. Trial counsel's failure to object to the State's jury instruction

¶46    Next, Kelsey argues that his trial counsel provided ineffective assistance by failing to object to the circuit court's use of the State's proposed jury instruction for repeated sexual assault of a child.  Kelsey contends that the jury instruction denied him his due process rights and his right to a unanimous verdict.

¶47    Whether a jury instruction provided by a circuit court "deprives a defendant of his [or her] right to due process is a question of law, which we review de novo." *State v. Trammell*, 2019 WI 59, ¶16, 387 Wis. 2d 156, 928 N.W.2d 564 (citation omitted).  Similarly, "[w]hether a jury instruction correctly states the law is a question of law that we review de novo." *State v. Langlois*, 2018 WI 73, ¶34, 382 Wis. 2d 414, 913 N.W.2d 812.

¶48    The State charged Kelsey with violating WIS. STAT. § 948.025(1)(b). In order to find a defendant guilty under § 948.025(1)(b), a "jury must unanimously

18

agree that at least 3 violations of [WIS. STAT. §] 948.02(1)(am), (b), or (c) occurred within the specified period of time but need not agree on which acts constitute the requisite number." Sec. 948.025(2)(b). At trial, the State did not allege that Kelsey violated § 948.02(1)(am) or (c).[8] Rather, the State alleged that Kelsey violated § 948.02(1)(b) based on Anna's claims that Kelsey had, on approximately eight occasions, "put his private part in [her] mouth." A defendant violates § 948.02(1)(b) when he or she "has *sexual intercourse* with a person who has not attained the age of 12 years." *Id.* (emphasis added). "Sexual intercourse" is defined by statute to mean, among other things, "fellatio." WIS. STAT. § 948.01(6).

¶49    The jury instruction proposed by the State, and used by the circuit court, was a combination of two standard instructions, *see* WIS JI—CRIMINAL 2107 (2019); WIS JI—CRIMINAL 2101B (2010), and, as relevant here, stated that Kelsey was alleged to have violated WIS. STAT. § 948.02(1)(b), which required the State to prove that Kelsey "had sexual intercourse with [Anna]." The instruction further provided, "Before you find the defendant guilty, you must unanimously agree that at least three *sexual assaults* occurred" between the relevant dates, "but you need not agree on which acts constitute the required three." (Emphasis added.) The instruction defined "sexual intercourse" to include "fellatio." "Fellatio" was defined as "oral contact with the penis."

¶50    Kelsey contends that the jury instruction the circuit court used should have read that the jury "must unanimously agree" that Kelsey had "sexual intercourse" with Anna at least three times, not that "at least three *sexual assaults*

---

[8] A violation of WIS. STAT. § 948.02(1)(am) occurs when an individual "has sexual contact or sexual intercourse with a person who has not attained the age of 13 years and causes great bodily harm to the person." A violation of § 948.02(1)(c) occurs when an individual "has sexual intercourse with a person who has not attained the age of 16 years by use or threat of force or violence."

occurred." Kelsey asserts that this distinction is significant because "'[s]exual contact' with a child under 13 is also considered 'sexual assault' under WIS. STAT. § 948.02(1)(e)." In other words, Kelsey argues that the "sexual assault" language, as used in the jury instruction in this case, created an improper inference that "sexual intercourse" could include "sexual contact," and, therefore, the jury could have convicted him based on Anna's testimony that he had touched her "by the private part and the breasts." Such a finding by the jury, according to Kelsey, would mean that the jury did not unanimously convict him of repeated sexual assault of a child based on three or more violations of § 948.02(1)(b).

¶51 We disagree that the circuit court's use of WIS JI—CRIMINAL 2107 (2019) was in error. The State correctly asserts that the jury instruction uses the term "sexual assault" because the instruction is used when a defendant is charged with repeated acts of sexual assault of a child, contrary to WIS. STAT. § 948.025(1). Both § 948.025(1) and WIS. STAT. § 948.02(1)(b) criminalize "sexual assault." Section 948.025(1) can be violated when a defendant commits sexual contact, sexual intercourse, or both. Accordingly, depending on the facts presented, the instruction must be tailored to include the applicable definition of "sexual assault." Here, that definition involved "sexual intercourse," which was defined by the court to include "fellatio." Importantly, no other definition of "sexual assault" or "sexual intercourse" was provided to the jury.

¶52 Therefore, the instruction informed the jury that, in order to find Kelsey guilty, it needed to find that "oral contact with the penis" occurred between Kelsey and Anna on at least three occasions during the applicable time period. The instruction comported both with the relevant statutory provisions and controlling case law requiring a unanimous jury verdict. *See generally **State v. Johnson***, 2001 WI 52, 243 Wis. 2d 365, 627 N.W.2d 455.

20

¶53     To the extent that Kelsey argues that his trial counsel should have objected to the jury instruction on the basis that it misled the jury in violation of his due process rights, we similarly reject this assertion. "A defendant is entitled to reversal if 'there is a reasonable likelihood that the jury applied the challenged instruction … in a manner that violates the constitution.'" *State v. Burris*, 2011 WI 32, ¶45, 333 Wis. 2d 87, 797 N.W.2d 430 (citation omitted). The reasonable likelihood standard requires more than a mere "possibility." *Id.*, ¶49.

¶54     Although Anna testified that Kelsey sexually assaulted her in more than one way—i.e., that Kelsey had sexual contact and sexual intercourse with her—we agree with the State that the jury instruction directed the jury to convict Kelsey only based on sexual intercourse with Anna. The only definition of sexual assault provided to the jury was that of sexual intercourse, which was defined only as including fellatio. Moreover, the State informed the jury both in its closing and opening statements that the only form of sexual assault it was alleging for purposes of conviction was sexual intercourse.

¶55     Accordingly, the jury instruction limited the jury to considering whether Kelsey had sexual intercourse—specifically, fellatio—with Anna in violation of WIS. STAT. § 948.02(1)(b). Given these facts, there is not a reasonable likelihood that the instruction misled the jury into impermissibly considering accusations of sexual contact. Because the jury instruction did not violate Kelsey's constitutional rights, Kelsey's trial counsel did not perform deficiently by failing to make a meritless objection to the instruction.[9] *See State v. Counihan*, 2020 WI 12,

---

[9] Because we conclude that the jury instruction comports with constitutional principles, we also reject Kelsey's claim that he was denied his due process rights and his right to a unanimous jury verdict. We note that Kelsey does not appear to challenge the constitutionality of the pattern jury instructions previously mentioned.

¶51 n.15, 390 Wis. 2d 172, 938 N.W.2d 530 ("The failure to raise a meritless objection does not constitute deficient performance.").

## II. Postconviction discovery

¶56 Finally, Kelsey argues that he is entitled to postconviction discovery of Anna's school records, additional CPS records, and Willa's medical and criminal history records. A defendant has a due process "right to post[]conviction discovery when the sought-after evidence is relevant to an issue of consequence." *State v. O'Brien*, 223 Wis. 2d 303, 321, 588 N.W.2d 8 (1999). "[E]vidence is [consequential] only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* (alterations in original; footnote omitted; citation omitted). "The mere possibility that an item of undisclosed information might have helped the defense … does not establish '[a consequential fact]' in the constitutional sense." *Id.* (alteration in original; citation omitted).

¶57 The circuit court denied Kelsey's motion for postconviction discovery after concluding that his trial counsel was not ineffective because he was not deficient. We conclude, with the exception of Willa's criminal history and medical records, that this decision was correct because counsel's strategy not to independently investigate the records was reasonable. At this point, the records would be relevant only to show that Kelsey was prejudiced by counsel's performance under *Strickland*. But because Kelsey cannot show that counsel's strategy not to investigate or use those records was unreasonable, postconviction discovery of the records is unnecessary.

¶58     In contrast, we have concluded that Kelsey was not prejudiced by his trial counsel's failure to impeach Willa with proof of her felony child abuse conviction. Thus, the issue remains of whether Kelsey is entitled to postconviction discovery of Willa's criminal history and medical records. Kelsey argues that the medical records, in particular, are consequential because the State "relied heavily on the theory that Kelsey could abuse Anna in Willa's presence" due to Kelsey "administering Willa's medication."

¶59     As we have previously explained, *see supra* ¶¶34-38, Willa's questionable credibility, including her substance abuse history and run-ins with CPS, was well documented at trial. For example, Willa testified that, at the time of the trial, she was required to take "random urinalyses through" an intensive outpatient program. Willa also stated that she had occasionally "overmedicated, sometimes intentionally" and that she had previously snorted her Wellbutrin medication. Additionally, Willa testified that, in 2011, she was intoxicated while breastfeeding one of her children and was ultimately admitted to the ER to "detox." Thus, further impeachment evidence targeting Willa's substance abuse and criminal history would be cumulative and does not constitute a consequential fact. *See **O'Brien**, 223 Wis. 2d at 321.

¶60     In addition, as the State posits, it is unclear why Kelsey cannot independently access Willa's criminal history through a public records search. Further, Kelsey does not explain how CPS records related to Willa's alleged "physical abuse" of her children would be relevant to the question of whether Kelsey sexually assaulted Anna. We therefore affirm the denial of Kelsey's motion for postconviction discovery.

        *By the Court.*—Judgment and order affirmed.

23

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.