COURT OF APPEALS
DECISION
DATED AND FILED

October 8, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP2037-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2020CF1272

IN COURT OF APPEALS
DISTRICT II

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

TUCKER RAIN ZIMMERMAN,

DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Waukesha County: PAUL BUGENHAGEN, JR., Judge. *Affirmed*.

Before Neubauer, P.J., Gundrum, and Grogan, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Tucker Rain Zimmerman appeals the judgment convicting him of first-degree recklessly endangering safety. *See* WIS. STAT. § 941.30(1) (2019-20).[1] Zimmerman argues that the evidence was insufficient to support his conviction. We affirm.

¶2 The State charged Zimmerman with numerous crimes following the death of his girlfriend, Sarah,[2] who died of a drug overdose in the early morning hours of December 13, 2019. As relevant here, Zimmerman was charged with first-degree reckless homicide as party to a crime, *see* WIS. STAT. §§ 940.02(2)(a), 939.05, and first-degree recklessly endangering safety, *see* WIS. STAT. § 941.30(1). Zimmerman pled not guilty, and the case proceeded to trial.

¶3 At trial, Sarah's mother testified to finding Sarah and Zimmerman at her house when she and her husband returned home from a trip to Florida the evening of December 12, 2019. Although 20-year-old Sarah lived at home with her parents, she was supposed to be staying with her grandmother while her parents were away because she struggled with addiction and her parents did not trust her to stay home alone. Disappointed with the circumstances but not wanting to start an argument, her parents went to bed shortly after 9:00 p.m.

¶4 Hours later, at about 3:00 a.m. the next morning, Zimmerman woke Sarah's mother and led her to Sarah's bedroom, where Sarah lay on the floor motionless and unconscious. Sarah's mother found Sarah's body cold and called for her husband, who performed CPR on Sarah while her mother called 911.

---

[1] All references to the Wisconsin Statutes are to the 2019-20 version.

[2] This matter involves the victim of a crime. Pursuant to WIS. STAT. RULE 809.86(4), we use a pseudonym instead of the victim's name.

¶5 Paramedics arrived at about 3:15 a.m. and tried to revive Sarah but could not do so. She was pronounced dead in her bedroom. The medical examiner who performed Sarah's autopsy concluded that she died of "acute Fentanyl and Alprazolam intoxication." The examiner testified that the combination of drugs was particularly problematic, but the alprazolam level was not especially high; rather, the fentanyl was the primary factor causing her death.

¶6 While Zimmerman initially denied that Sarah had gone anywhere when he first spoke with police, subsequent investigation revealed that Zimmerman and Sarah had traveled to Milwaukee at least twice before her overdose to acquire drugs. Cell-phone data from December 11, 2019 showed Zimmerman contacting two different heroin suppliers; a camera scanned the license plate of Sarah's father's truck in Milwaukee twice that afternoon; and Sarah recorded a video on her phone shortly thereafter showing Zimmerman driving her father's truck and a bag of pills on her lap. Cell-phone data, traffic camera footage, and a convenience-store receipt from December 12, 2019 show that Zimmerman and Sarah went back to Milwaukee that evening. Both of their phones pinged a Milwaukee cell tower at 5:50 p.m. Zimmerman called at least two different dealers between 6:00 and 6:30 p.m.; he bought tin foil—which serves multiple purposes in drug use—at a gas station; and he returned with Sarah to her house around 8:00 p.m.

¶7 Moreover, while Zimmerman initially told police that he fell asleep at about 1:00 a.m. and awoke at about 3:00 a.m. on December 13 to find Sarah slouched over in the bathroom, the internet search history and videos taken on Sarah's phone revealed that Zimmerman was awake and aware that Sarah had overdosed.

¶8     At about 12:20 a.m., Zimmerman recorded a video in which he called Sarah a number of expletives while she laid nonresponsive and covered in vomit. Pointing into the camera, Zimmerman told Sarah that she was "a piece of f[--] s[--]" who "need[s] to get clean." Zimmerman directed the camera to an empty spot on Sarah's bathroom floor and said, "You f[--] passed out right f[--] there." He then turned the camera to the floor of Sarah's bedroom where Sarah was lying on her back with her head dangling loosely. Zimmerman zoomed in on Sarah's face, revealing that her eyes were partially open and that her face was covered in vomit. Zimmerman ended the video in a close-up shot, stating, "You are puking everywhere, you are f[--] dead."

¶9     Following this and two additional brief videos, Zimmerman made a series of Google searches on Sarah's phone, including: "how to give CPR," "how to pump someone's stomach," and "how to pump someone's stomach at home"—each of which he made three to five times. When Sarah's condition remained unchanged an hour later, Zimmerman called a friend. The friend was sleeping and did not answer, so at about 1:45 a.m., Zimmerman texted him, "[C]all me right now. It's Tucker. I'm really worried about [Sarah]." At 2:04 a.m., Zimmerman returned to Google, searching "what to do if [I'm] not sure if someone is breathing well."

¶10     At 2:15 a.m., Zimmerman recorded another video. The video showed that Sarah had been rolled onto her side and that the vomit had been cleaned up. After briefly scanning Sarah's motionless body, Zimmerman spoke into the camera: "I just got you, you know, keeping you … breathing." He then says, "This is f[-ed] up [Sarah]," and "I'm about to tell your f[-ing] mom."

¶11 Instead of reaching out to Sarah's mom at this time, Zimmerman messaged a friend on Facebook, insulting Sarah's intelligence and ridiculing her for taking "fake … Xanax." When Zimmerman told his friend he was about to take Sarah to the emergency room, his friend advised him to take her "now" or to call an ambulance. Zimmerman instead continued the Facebook conversation with his friend, stating that he had Sarah "breathing," but was "not trying to stay up all night." Zimmerman's friend added that Sarah was "nothing but [a] headache," then Zimmerman changed the subject, asking his friend where he was hanging out.

¶12 At 2:42 a.m., Zimmerman recorded another video on Sarah's phone. Sarah had been rolled from her side to her stomach. Zimmerman addressed Sarah directly again, swearing at her numerous times and scolding her for vomiting. Minutes later, Zimmerman made five additional Google searches, including "what to do if [I'm] not sure if someone is breathing well," and "what does it mean if [I'm] giving [CPR] and [I] hear stomach gurgling."

¶13 While Zimmerman initially told police who responded to the 911 call that Sarah had not taken any substances, he gradually changed his story. He first admitted that Sarah had in fact taken Xanax. Zimmerman later suggested to police that they give Sarah Narcan, a medicine used to counteract the effects of opiates, including fentanyl. Even after police advised Zimmerman that Narcan would be ineffective for a Xanax overdose, Zimmerman said "just N[arcan] her."

¶14 The jury acquitted Zimmerman of the first-degree reckless homicide charge but found him guilty of first-degree recklessly endangering safety. He appeals.

¶15 On appeal, Zimmerman challenges the sufficiency of the evidence. Whether the evidence is sufficient to support a jury's guilty verdict is a question of

law subject to de novo review. *State v. Smith*, 2012 WI 91, ¶24, 342 Wis. 2d 710, 817 N.W.2d 410. This Court will uphold the verdict unless the evidence "is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." *Id.* (*quoting State v. Poellinger*, 153 Wis. 2d 493, 507, 451 N.W.2d 752 (1990)). The sufficiency of the evidence test is the same regardless of whether the evidence is direct or circumstantial. *Poellinger*, 153 Wis. 2d at 501. If any possibility exists that the trier of fact could have drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt, we may not overturn a verdict even if we believe that the trier of fact should not have found guilt based on the evidence before it. *Id.* at 507. "[I]f more than one reasonable inference can be drawn from the evidence, we must adopt the inference that supports the verdict." *State v. Mertes*, 2008 WI App 179, ¶10, 315 Wis. 2d 756, 762 N.W.2d 813. Moreover, we consider the totality of the evidence when conducting a sufficiency of the evidence review. *See Smith*, 342 Wis. 2d 710, ¶36 (A jury is not required to "ignore the larger picture so as to focus on each piece in a vacuum and ask whether that piece standing alone supports a finding of guilt.").

¶16 To convict Zimmerman of first-degree recklessly endangering safety, the State had to prove that he endangered Sarah's safety by criminally reckless conduct and that the circumstances showed utter disregard for human life. *See* WIS. STAT. § 941.30(1). "Criminally reckless conduct" means:

- the conduct created a risk of death or great bodily harm to another person; and

- the risk of death or great bodily harm was unreasonable and substantial; and

- the defendant was aware that [his] conduct created the unreasonable and substantial risk of death or great bodily harm.

6

*See* WIS JI—CRIMINAL 1345; WIS. STAT. § 939.24. "'Great bodily harm' means injury which creates a substantial risk of death, or which causes serious permanent disfigurement, or which causes a permanent or protracted loss or impairment of the function of any bodily member or organ, or other serious bodily injury." WIS JI—CRIMINAL 1345. "[W]hen evaluating whether a defendant's conduct reflects utter disregard for human life, the fact-finder should examine the totality of the circumstances surrounding the crime." *State v. Burris*, 2011 WI 32, ¶41, 333 Wis. 2d 87, 110, 797 N.W.2d 430. A jury "should consider all relevant conduct before, during and after a crime, giving each the weight it deems appropriate under the circumstances." *Id.*

> [Utter disregard] can be (and often is) proven by evidence relating to the defendant's subjective state of mind—by the defendant's statements, for example, before, during and after the crime. But it can also be established by evidence of heightened risk, because of special vulnerabilities of the victim, for example, or evidence of a particularly obvious, potentially lethal danger. However it is proven, the element of utter disregard for human life is measured objectively, on the basis of what a reasonable person in the defendant's position would have known.

*State v. Jensen*, 2000 WI 84, ¶17, 236 Wis. 2d 521, 613 N.W.2d 170.

¶17 Turning to the trial evidence, we first conclude that the evidence sufficiently showed that Zimmerman endangered Sarah's safety by helping her obtain the drugs on which she overdosed. As noted above, the evidence established that Zimmerman knew how to acquire drugs and that he actively sought to acquire drugs from multiple suppliers. He and Sarah engaged these sources on December 11 and December 12, 2019—in the latter case, just hours before Sarah's overdose. From this evidence, the jury could reasonably find that Zimmerman and Sarah sought drugs, traveled to Milwaukee together to buy them, and that Sarah took them.

¶18     Zimmerman's argument that he could not have endangered Sarah's safety by helping her obtain the drugs that caused her death, because delivery is an element of first-degree reckless homicide and he was acquitted of that charge, has no support in law.  A jury is permitted to render inconsistent verdicts.  *State v. Rice*, 2008 WI App 10, ¶¶26-27, 307 Wis. 2d 335, 743 N.W.2d 517.  Similarly, Zimmerman's argument that the jury was limited to focusing on Zimmerman's conduct after Sarah began overdosing, because the State's prosecutorial theory centered on that conduct, has no basis in law.  We do not compare the facts supporting the jury's verdict to the State's closing argument; rather, we determine whether a reasonable trier of fact could have reached a guilty verdict based on the totality of the evidence.  *See Poellinger*, 153 Wis. 2d at 507.

¶19     Second, the jury had ample evidence to conclude that Zimmerman's supplying Sarah with dangerous drugs and taking videos and messaging with friends for hours when she was unconscious and nonresponsive, not only created an unreasonable and substantial risk of death or great bodily harm, but also demonstrated that Zimmerman was aware of the consequences of his conduct. *See* WIS. STAT. § 939.24 (defining "criminal recklessness").  In arguing that the evidence was insufficient to prove criminal recklessness, Zimmerman again narrows his focus to the timeframe immediately following Sarah's overdose, positing that he was "prosecuted for what he *didn't* do while [Sarah] was suffering from an overdose."  But this view leaves out the fact that he helped create the conditions of her overdose by helping her procure the drugs that caused her death. It also fails to acknowledge how, by choosing to make videos, messaging friends, and searching on the internet for hours, he increased the likelihood that the overdose would become deadly.  Moreover, the substance of Zimmerman's internet searches, his messages to friends, and requests that police administer

Narcan—a medicine well-known to counteract the effects of fentanyl—show that he was aware of the risk his actions created.

¶20    Finally, the jury could have concluded that the circumstances showed Zimmerman's utter disregard for Sarah's life.  As noted, Zimmerman helped Sarah procure the drugs that caused her death, and understood that Sarah was suffering from a potentially fatal drug overdose.  In his first video recorded at 12:20 a.m., he told Sarah that she needed to "get clean," implying that drugs had rendered her unconscious.  His Google searches revealed that he knew Sarah required lifesaving medical care, as he posed questions about CPR and breathing troubles.  He also called a friend, and when he did not respond, then immediately texted, "[C]all me right now.  It's Tucker.  I'm really worried about [Sarah]."  He conveyed the same sense of urgency in his Facebook message exchange with another friend, stating that he was "about to take [Sarah] to the … emergency room" because she was "not responding" and probably needed "her stomach pumped."  In sum, the jury had overwhelming evidence that a reasonable person in Zimmerman's position would have known that Sarah required immediate medical intervention but Zimmerman chose instead to expose her to the "particularly obvious, potentially lethal danger" of a drug overdose.  *See* ***Burris***, 333 Wis. 2d 87, ¶41; ***Jensen***, 236 Wis. 2d 521, ¶17.

¶21    While Zimmerman uses this same evidence to argue he did in fact show concern and regard for Sarah's life, the jury could have concluded that, by relying on Google searches and perfunctory communications with friends rather than seeking actual medical care for Sarah, Zimmerman sought to address Sarah's symptoms in a way that would render him less culpable rather than confront the reality of her suffering.  This conclusion is bolstered by Zimmerman's repeated lies to police as well as the callous indifference exhibited in the videos and

communications with his friends. In the videos, he berated Sarah with expletive-laced and derogatory remarks, including calling her "f[-]ing dead." He blamed her for struggling to breathe and preventing him from going to bed. In his Facebook messages, when his friend insulted Sarah's intelligence and called her "nothing but [a] headache," Zimmerman merely asked his friend what he was up to, as if he was looking to leave his unconscious girlfriend for a more enjoyable night out. Viewing the totality of the evidence in the light most favorable to the verdict as we are required to do, *see Burris*, 333 Wis. 2d 87, ¶41; *Poellinger*, 153 Wis. 2d at 507, we therefore conclude that the jury could reasonably find that Zimmerman's conduct showed utter disregard for human life.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.